MICA INSULATOR CO. v. UNION MICA CO. et al.

(Circuit Court, D. New Jersey. May 9, 1905.)

1. PATENTS—INFRINGEMENT—MICANITE.

The Dyer patent, No. 483,646, for a process of making artificial mica sheets for electrical insulation, called "micanite," by uniting a series of layers of irregularly shaped mica scales, laid to overlap, by means of varnish, and under pressure, until a sheet of the required thickness is

formed, was not anticipated, and discloses patentable invention. Also held infringed as to claims 1 and 2.

2. SAME—VALIDITY—DEFENSE OF PRIOR USE.
Evidence considered, and held insufficient to invalidate a patent on the ground of prior use.

3. SAME—PROCESS OF MOLDING MICA SHEETS.
The Jefferson patent, No. 483,653, claim 2, for a process of molding an artificial mica sheet, is void for anticipation, if construed as a continuation of the Dyer process of making such sheets, being covered by claim 2 of the Dyer patent, No. 483,646, and for lack of invention if otherwise construed.

In Equity.

Kenyon & Kenyon, Wm. Houston Kenyon, and Richard Eyre, for complainant.

A. Bell Malcomson, for defendant.

GRAY, Circuit Judge. The bill in this case charges infringement by defendants of letters patent No. 483,646, issued October 4, 1892, to Arthur H. S. Dyer, and letters patent No. 483,653, of the same date, to Charles W. Jefferson. Claims 1 and 2 of the Dyer patent and claim 2 of the Jefferson patent are the ones here involved. Both complainant and defendant are corporations of the state of New Jersey, and the record shows that by legal assignment the complainant has become the owner of the patents in suit. There is no serious contest as to the jurisdiction, parties or alleged acts of infringement of the patents. The defenses are those of anticipation, lack of invention, and noninfringement.

The Dyer patent in suit relates to a process of making artificial mica sheets for electrical insulation. The evidence shows, and it is not disputed, that mica possesses, to a greater degree than any known substance, the qualities desirable for insulators of electricity. In its natural state, it is characterized by "perfect basal cleavage, in consequence of which it can be readily separated into extremely thin, tough, and usually elastic laminæ." In describing the forms in which mica was used for electrical insulation prior to the form produced by the process of the patent in suit, Mr. Wightman, an electrical engineer and an expert witness for complainant, says:

"Previous to that time there were three forms of mica that were used as an insulator in the designing of electrical machinery; that is, in its natural state, in the form known as 'built up' mica, and as a compound made up of a mixture of mica and cement. Natural mica was used where a thin flat sheet could be employed, but on account of its comparatively high price, could not be used to cover large areas. To overcome this objection, a form of mica known as 'built up' mica was employed; this came to my knowledge about the year 1887. It consisted in superimposing properly cut sheets of mica upon one another, in such a way that the joints in the different layers were broken, the pieces used in building up were obtained by splitting the natural mica at such places where a weakness in its structure was apparent; that is, the natural mica was not separated down to the limit, or to obtain the elementary laminæ. The pieces of mica so superimposed, were held together by a coating of shellac or similar adhesive material. This building up process resembled the placing of bricks in a wall. Care had to be taken that adjacent pieces in a layer were of the same thickness; the whole product was a comparatively crude makeshift, and served only as a cheaper substitute for natural mica. In some cases, however, such

as the conical insulating rings of commutators, it was possible to obtain a structure, which could not be obtained from natural mica, by this process of building up.

"Others, about this time, sought to obtain the advantages of natural mica by forming a mixture of pulverized, or finely comminuted mica, with cement, shellac or other plastic materials. The only advantage of this material was that it could be molded, but it contained none of the fundamental advantages of mica as an insulator. It was more of a cement insulator, and its heat (sic) and electrical resisting properties were only those of the particular plastic material of which it was made.

"The problem of providing a reasonably cheap, uniform, homogeneous, noninflammable insulating material, was not met by either of these forms of insulation."

Mica sheets in their natural state could only be obtained in small sizes of irregular shape, measuring one, two or three inches lengthwise or across. Larger sizes were rare and correspondingly expensive, five by six inches being nearly the extreme dimensions. The smaller sizes, and scrap or waste mica, had practically no value. Dyer, in the specifications of his letters patent for the invention of new and useful means in the process of making artificial mica sheets for electrical insulation, says:

"Heretofore it has been proposed and common to construct insulating plates of pulverized mica mixed with a hardening cement, the same being further sometimes modified by being reinforced by coarse fabrics or mechanically or chemically combined with other substances, such as pulverized talc, silica, and similar pulverized electrical insulating substances. Plates formed in this manner are much more imperfect as to durability and efficiency and more costly and difficult of manipulation than the sheets formed by my process.

"In order to understand the object of my invention, it may be stated that in the construction of electrical apparatus—such, for example, as armatures and field magnets of dynamos and commutators—it is at present customary to place natural plates of mica for the purpose of insulating the elements of the apparatus between which the said plates are placed.

"The natural plate of mica is very costly, especially when large. It is easily broken when handled or bent, cracks at the edges when cut or trimmed, and is accompanied by many other difficulties well known to electrical manufacturers. These difficulties are removed by the process of my invention. When natural plates are employed, spaces exist between the laminæ and are apt to contain conducting liquids, such as moisture. This is another important defect overcome by my invention. It is difficult to find natural mica plates of uniform thickness, rendering it unfit for use in separating commutator sections.

"A very important outcome of my invention is that I can form artificial plates superior to the natural by means of small scales formed from very small or 'waste' mica.

"Briefly described, my invention involves the combination of laminated elementary scales of mica of any given sizes and shapes, fastened together irregularly by an insulating cement under pressure, and elementary scales of larger size similarly fastened to the sheet upon one or both sides or in the middle as a core."

Claims 1 and 2 of the patent are as follows:

"(1) The method of manufacturing electrical insulating mica sheets, the same consisting in varnishing a large sheet of iron or similar foundation-plate and placing thereon a series of smaller mica scales with their edges over-lapping each other, varnishing the layer of scales and applying a second series of smaller sheets with their edges overlapping, continuing in the same manner until a plate of the required thickness is formed, heating the sheet to partially evaporate the solvent of the varnish, rolling the same to remove

the excess of the varnish, subjecting the sheet to a heavy pressure, and finally cooling it, as hereinbefore described.

"(2) The herein-described method of building up electrical insulating mica sheets, consisting in varnishing a foundation-plate, placing mica scales thereon while the varnish is still wet, or soft with their edges overlapping, varnishing the mica sheets, thus forming a second and third, &c., layer of mica in a similar manner until the required thickness of mica sheets is obtained, and chilling the sheet while rigidly held in a curved position." ·

The defendant contends that, in view of the prior art, there was no patentable novelty in the process here claimed, and that the essential principle of the process was anticipated in prior patents and in unpatented devices in prior use. The only ones of the prior patents cited that are discussed at length by defendant's counsel, are the Lee patent, of 1888, and the Thompson patent, of 1890. A reference to the Lee patent will show that its process relates to a composition of comminuted mica and shellac, or resinous gum; that is, to a *mixture* which, in a plastic state, is rolled into sheets. The essential character of this composition is clearly stated in the specifications of the patent, as follows (the italics being my own):

"In the form in which I prefer my composition it consists of mica comminuted so as to form scales or laminæ, varying in size from very small fragments to pieces one-eighth or one-quarter of an inch, or even larger, mixed with shellac in the proportion of about sixty-five parts of mica, by weight, to thirty-five parts of shellac. These proportions may of course be varied; but I prefer the proportions given for the best results. The mica is *incorporated* with the shellac by the aid of heat, which softens the shellac, after which any suitable method of *mixing* the substances may be employed. I prefer to mix them by means of a friction-roll mixer, of well known construction, consisting of a pair of heated rolls, one roll running at about one-third greater speed than the other roll. The pieces of shellac and mica are *mixed* and thrown together onto the hot rolls, which revolve side by side and may be adjusted relatively to each other, and as the *mixture* passes through into a trough or receiver placed underneath it is again put onto the rolls, and this working is continued until it *becomes a plastic mass*, when it will adhere to one of the rolls, whence it is skived off with the aid of a knife and laid aside in a flat sheet. To prepare these sheets for molding, in case they are allowed to cool, I prefer to place them on a steam table, and thus heat them until they become plastic and workable again, after which the sheets, or parts of them, of a proper size, are put into hot molds, molded under pressure, and allowed to cool. Such a composition will take a clear and fine impression in the molds, is comparatively light, very strong and durable, and may be used for a great variety of purposes. In mixing the mica and shellac to form a sheet of composition, the laminæ of mica *tend to a parallel position*, and as they overlap and interlock the breaking strength of the composition is very much greater than that of compositions in which laminated material is not used."

The defendant relies upon the language in this quotation, which speaks of the mica as "comminuted so as to form scales or laminæ, varying from very small sizes to pieces one-eighth or one-quarter of an inch or even larger, *mixed* with shellac," etc., and also upon the following statement, as above quoted:

"In *mixing* the mica and shellac to form a sheet of composition, the laminæ of mica *tend* to a parallel position, and as they overlap and interlock, the breaking strength of the composition is very much greater than that of compositions in which laminated material is not used."

It seems perfectly clear that a sheet of the material made by the process thus described is very different from that resulting

from the process of the patent in suit. It is a composition or mixture of mica and shellac made into a plastic mass, and rolled into sheets in which there is a tendency of the comminuted mica to lie in minute parallel scales and overlap. This is not at all a mica sheet, from which the volatile parts of the shellac varnish have been evaporated, and the remaining part reduced to the thinnest conceivable film between the layers of mica scales. It is unnecessary to quote from complainant's expert testimony on this point. Multiplication of words would only tend to obscure what is in itself so clear.

The Thompson patent, according to its specifications, "relates to the construction of an insulating septum or layer interposed between electric coils and their core or carrier, or between two sets of electric coils, for the purpose of maintaining through insulation between the parts lying at opposite sides of such layer." The patentee further on says:

"My invention consists, essentially, of a compound insulating layer or septum composed of two or more parts, one of which is nonporous or of close texture or nature—such as mica, glass, or similar earthy or mineral substance—and impervious to moisture, while the other part, forming a bolster or backing to which the first is bound, consists of some fibrous or nonlaminated material, preferably in the form of cloth woven or felted, and composed, preferably, of noninflammable material, like asbestos."

It is sufficient to state roughly that this process consists, first, in wrapping around a cylindrical core a fibrous coating of noninflammable material, such as asbestos paper or cloth. "Next," say the specifications "is applied the layer of insulating material (nonporous) formed of some vitreous or earthy material, such as mica in the form of thin plates." We have already seen that it is difficult and expensive to obtain mica sheets of dimensions, longitudinal and transverse, greater than four by five or four by three inches. If the core to be wrapped is of considerable size—say five or six or more inches in diameter, a number of these sheets will be required to completely wrap it, so the process is practically to bend the small sheets on the surface of the core, lapping the end of one by the end of each succeeding sheet, making one or two layers in this manner. These layers "are bound down," say the specifications, "by any suitable means," such as cotton or linen cloth, and the coils of the armature wound directly upon it. It is perfectly obvious that this process and its object are entirely different from those of the process of the patent in suit. It is true, the ends of the sheets overlap each other in the process of being wrapped around the core, but that does not constitute a continuous artificial sheet of mica, capable of being wound around such a core, as a sheet of paper is wound around a bundle. The resort to such processes to utilize the valuable insulating qualities of mica for the electrical art, as is illustrated by these patents, tends to support the novelty and invention claimed for the process of the patent in suit.

One method of the prior art as yet unconsidered, was the building

up of a mica strip, by using sheets of mica as large as could conveniently be obtained, and cutting them into rectangular shapes and sizes as nearly uniform as possible, then making a layer of these by butt-joining. Upon the top of such layer, with suitable varnish or shellac between, is superimposed another layer, in the same way, breaking or covering the joints of the first layer after the manner of laying bricks. The sheet thus produced, however, had various defects. Professor Anthony, in speaking of it, says:

"Such a built-up mica was serviceable in places where it could be built up in place, but was not suitable for making molded forms, because any attempt to bend it or shape it into irregular forms, would open up the joints. Furthermore, in the building up of this mica by the break joint (or butt joint) process, no one had conceived the idea of splitting the mica into its ultimate scales, so that, even if the joints were opened up, the opening of the joints would do little harm."

The expert testimony on both sides shows that a substantially new material has, by the process of the patent in suit, been supplied to the electrical art in the form of an artificial mica sheet, practically of any length, breadth or thickness required, thus overcoming the obstacle of the restricted limits as to size, within which natural mica could be obtained. The trade name "micanite," given to this material by the patentee, has established for itself a recognized place in the electrical art. Mr. H. F. T. Erben, an electrical engineer and an expert witness for the complainant, thus testifies as to the comparative advantages of micanite over natural mica:

"Micanite is cheaper, due to the possibility of its being composed of pieces of mica of less area than in the case of pasted mica. 2d. It is more uniform as to dielectric strength, has a less possibility of flaws. 3d. Micanite can be easily molded when heated, into various shapes; whereas, such molding is practically impossible with pasted mica. 4th. Micanite can be easily cut into any desired form by means of a knife or band saw; whereas, pasted mica has a tendency to rip and tear under similar treatment. 5th. Micanite has rendered possible the construction of commutators having bars of 3 to 4 inches radial depth; such construction would be difficult, if not prohibitive, in the case of pasted mica, due to the impossibility of obtaining sheets of sufficient size. 6th. Micanite has allowed manufacturers to construct side mica that will prevent short-circuiting of adjacent commutator bars, as with this material there can be no pockets due to imperfectly butted joints, as in the case of pasted mica, such pockets becoming filled with a mixture of carbon dust, copper dust and lubricating oil, would give rise to incipient arcs, which would soon lead to short circuits between the adjacent bars. If such material did not exist, the construction of electrical apparatus would be much more difficult than at present, the danger from short-circuiting would be much greater; and the cost of repairs and renewals greatly increased. Q. Is it a matter of any great importance that a mica insulating material should be uniform throughout as to its dielectric strength? A. Such properties are of great importance, as with large exposed surfaces there is liable to be a defect in the insulation if it were constructed in accordance with the old method. In accordance with the new construction the splitting of the mica into very thin layers practically removes all foreign matter."

A very interesting exposition of the state of the art, into which this substance called "micanite" entered, is given in a paper read by Mr. Edward P. Thompson, a well-known electrical and mechanical engineer, before the American Institute of Electrical En-

gineers, December 21, 1892.   The following extracts from this address are instructive:

"Of all substances, mica probably is the best material for use in armatures, if it is desired to obtain not only efficient electric insulation, but also durability under the influence of heat.   The highest temperature to which an armature is subjected, even by short circuit or bad construction, will have no injurious effect upon mica.   Mica, thick or thin, may be held in a gas flame without cracking, burning or melting.   It remains unaffected.   The reason of this is better understood when it is remembered, that it consists of aluminic silicate, containing also potassic, sodic and lithic silicates. and some ferrous and ferric and manganic oxides.   Its chemical constitution varies. *. * *   The insulating power of mica is superior to that of any other substance applicable to armatures.   An advantage, peculiar to itself, is its even, laminated structure.   How wonderful is the thinness of its individual layers! A piece of ordinary writing paper is about .005 inch.   Mica layers have been obtained of a thinness of .00003 inch.   Mechanical difficulties prevent its being split thinner.   By pasting it upon a hard surface and splitting it off as much as possible, the remaining fragments are so thin as to become beautifully iridescent.   The builder of armatures can therefore split the sheets into any desired and uniform thickness with great ease and accuracy. An interesting property of mica and one not generally recognized, is its homogeneity of structure and clear transparency, although so black when thick.   The writer used a piece one-quarter of an inch thick for observing the late solar eclipse.   The effect was better than with smoked glass and as efficient as black glass much thicker.   A valuable property of mica in connection with commutator insulation is its proper degree of hardness, whereby it does not wear away too rapidly under the action of the brushes. If rubber were used, for example, even if it did not burn, yet it would wear off and sparking result, because the commutator surface would not be truly cylindrical.   The brushes would be set into vibration. * * *

"Although so superior for armature insulation, mica is, in its natural structure, accompanied by certain objections, which, in trying to overcome, were more serious than had been anticipated, as it was not until after a long series of trials that a successful article was produced, and not until a novel apparatus for cheapening the process of manufacture was devised. The apparatus is now in operation on a large scale.   The description at present is confined, however, to the article, and to full information of its structure, manner of using and properties.

"The objections alluded to are:—Mica, as found in nature, occurs in flat sheets only.   It has a high degree of elasticity, so that when once bent and released, it assumes its original form.   If folded, its brittleness causes fracture.   If the natural sheets are compressed in a mold, to try to form armature insulator heads, for instance, it is completely broken up.

"Secondly. Natural mica sheets correspond financially to plate glass.   The larger the sheet, the higher the cost per square inch.   Mica in small pieces, from 4 to 6 square inches, is exceedingly abundant and very cheap.   It is often called waste mica, because very limited in its uses, and consisting often of trimmings from larger and more useful sheets.   In medium and larger sizes of armatures, the naturally built up mica is so expensive as to be objectionable, although not so much so as to entirely prevent its employment.

"Thirdly. Between the hundreds, nay, thousands, of thin layers, damp air can enter, and also water, accidentally, which cannot easily or effectually be removed.

"Fourthly. Mica splits so easily that handling causes injury. .

"Fifthly. Mica cannot be cut transversely to advantage.   The edges are unworkmanlike, being ragged and jagged.   Neatness in drilling, sawing and turning is difficult.

"Among the attempts which have been made to overcome these objections are those involving the use of pulverized or comminuted mica, which is mixed with a liquid cement and stirred into a paste.   While still soft, the mixture is rolled or compressed into any desired form, as if consisting of so much plaster of paris.   In order to give it sufficient strength, one-third

of the product is cement. The mica sparkles here and there on the surface, as it glitters on granite. This article should be called a cement insulator, and not a mica insulator, because the current can flow in a straight circuit through the plate without encountering any mica. The cement forms numerous rectilinear paths for the current, independently of the mica; and therefore the product is in no sense an equivalent of mica."

Speaking of micanite, he says:

"Any of the sheets may be cut up into any desired size and shape. The layers cling together much more tenaciously than in the natural plate. The path of least resistance from one side of the plate to the other is in a straight line, and a straight line intersects numerous mica sheets, and, therefore, the article is a mica insulator and not a cement insulator. * * * Further, they are superior to a sheet of mica as it comes from the quarry, in that they do not absorb water or damp air; in that they are stronger to resist either pressure or tension; in that they may be neatly and easily sawed and drilled; in that they are enormously less costly; and in that they are of about the same resistance."

Professor Thompson also remarks on the capability of micanite to be molded into curved forms and given a permanent set; whereas natural mica plates could never be given a permanent set or be molded into curved forms.

While it is possible, it would indeed be strange, that one who has contributed to an important art so valuable a material as that which is known as micanite, should have done so by a process which did not involve the inventive faculty to discover. As has been often remarked, what seems simple enough after it has been done, was not so simple or obvious before the "happy thought" occurred to the inventor. As I have already said, the fact that others had endeavored to solve the difficulty by compositions or mixtures of comminuted or pulverized mica, with shellac or other resinous substance, lends material support to the claim of invention for the process that has so completely solved the difficulties in the way of economically and efficiently utilizing mica.

The essential principle which characterized the method of the first claim of the Dyer patent, and distinguished it from the prior methods of constructing artificial mica sheets, whether by the mixture or incorporation of pulverized or comminuted mica with a quantity of shellac or resinous gum, as heretofore described, or by the brick laying method of butt-joining pieces of mica, cut into rectangular shapes and of uniform, or nearly uniform size, was simply this: The taking of small pieces of waste mica of irregular sizes and shapes, and scaling the same into what are mechanically their elementary laminæ, and placing the same (necessarily by hand) systematically with their edges overlapping each other, upon an iron surface or table which has received a thin coating of shellac or other substance, calculated to hold the first layer of laminæ in place, as well as facilitate the removal of the sheet when completed; the result being a continuous layer of mica, the elementary thinness of the laminæ insuring this integral continuity and smoothness, the overlapping edges producing practically no ridges or inequalities. Over this smooth continuous surface, a thin coat of shellac is placed, and the process just described repeated, layer after layer, until the required thickness is attained.

While the sheet is still wet with the adhesive liquid, it is laid on a steam-heated table, and the solvent alcohol of the dissolved shellac, or the oil and turpentine of the varnish, are evaporated. The sheet is then passed between pressure rollers, which expel the superfluous varnish from between the layers, leaving only a thin film of the same which maintains the adhesion. Afterwards, and before the sheet is hardened, it is subjected to very heavy pressure by a hydraulic or other press, which serves to produce a compact laminated sheet. As a last step of the process, it is placed upon a cold plate and chilled and hardened. The sheet can be milled or planed then to reduce it to uniform thickness, and can be cut into sizes required. The advantages that this artificial mica sheet possesses over mica in the natural shape and over the products of other processes, have been set forth in the expert testimony, from which quotations have been above made, and are practically not disputed. The process is thus characterized by a product unique and admittedly of the greatest utility. To have made a homogeneous, tough, insulating sheet of practically pure mica, by thus carefully arranging small scales of mica, reduced to elementary tenuity, layer upon layer, as above described, however obvious it may now seem to one familiar with the result, had not occurred to others skilled in the art, though the want of such a product had long been felt, as proved by the prior practices of mixing comminuted or pulverized mica with cement or shellac varnish, and rolling the plastic mass into sheets. It cannot be said with truth that this advanced step in the art of electrical insulation was an obvious one to any one ordinarily skilled in such art. I have no difficulty in finding that the process of the Dyer patent in suit is unanticipated, and that it involves patentable invention.

In addition to the defense of anticipation by prior patents, the defendant alleges prior use, and produces witnesses in support thereof. Two witnesses testified to what defendant claims was a prior use of the process of the patent in suit by the Edison Company, at Menlo Park, New York. A careful examination of this testimony convinces me that the witnesses' recollection, after 15 years, has confused what they then did, with the micanite process, with which they were familiar at the time of testifying. The cross-examination tended to show this confusion in the minds of the witnesses, and to suggest that what was done at Menlo Park was the construction of a mica strip by the butt-joint method we have already described. No specimen of the material thus said to have been constructed by these witnesses was produced and no one else appeared to testify that he saw this process practiced by the witness. Another witness, named Cushing, testifies that at the age of 19, he worked with the Mather Electric Company, at Manchester, Conn., for a period of nine months from September, 1888, to June, 1889. In stating the manner in which mica was used, he says:

"In building up the commutators of the smaller sizes, single strips of mica were used, when sufficiently thick, wide and long. In the larger sizes, when the single strips of mica were not of sufficient length, breadth or thickness, several strips were used, by overlapping them, and shellacing them, trimming

them roughly and placing them between the segments, which were finally clamped together and turned down in a lathe. In placing the binding rings on the end of the armature, circular rings were built up in the same manner, trimmed to size and clamped in position, thus preventing short circuits between the segments at the end of the commutator segments."

In answer to the question, "What was the shape of these pieces?" he says:

"Simply miscellaneous strips of mica, best adapted for the particular segment to be insulated. Q. Would that term be covered by 'mica scales'; would those pieces be covered by the term 'mica scales'? (Objected to as leading.) A. I never heard the term 'mica scales' used at that time, or since in practice. Q. Please state * * * how many thicknesses of the individual, or smaller pieces there would be, in one completed piece forming the insulator? A. Two, or more, as the conditions required."

The method here described is evidently nearer akin to that of wrapping pieces of mica around a central core, or between the coils of a large electro-magnet, overlapping one piece with the succeeding piece necessary to continue the operation of wrapping already described, than to the process of making the artificial mica sheet of the patent in suit. Professor Anthony was engaged as consulting engineer at the Mather Electric Company, of Manchester, at the time of which Cushing speaks, and fully explains the practice referred to by him in the insulation of armatures, he (Anthony) being himself in charge of the Mather factory. He clearly shows that the practice referred to by Cushing was not correctly stated, and that it had no relation to the method of the patent in suit. The witness Traylor testifies that he was in the mica business in Richmond prior to 1888, and that while there, manufactured electrical mica insulation. He also testifies as to the manufacture of journals and valve sheets of mica, built up together with varnish and pressed and baked. His whole testimony lacks clearness as to what actually was the process practiced by him. Whatever it may have been, however, Professor Anthony clearly demonstrates the insufficiency of Traylor's testimony to establish any use of a process anticipating that of either of the patents in suit.

The only other testimony as to prior use, is that of one Ross, who worked with the Excelsior Electric Company for several years after 1887. His work appears to have been the repairing of armatures and commutators; that in so doing, he used fibre and mica as an insulating material. He says he used "the largest mica we could get." In answer to the question "How did you use it?" he says, "If we couldn't get mica large enough for the job, we would build it together, and if we could not get it big enough we would build it up." He says, "I would lay a piece of paper on the table, make a layer of mica the size that was wanted, and then overlap the pieces and work them together to build it up to the thickness required." His cross-examination makes it perfectly clear that this overlapping is not the overlapping of the edges of the several pieces in their respective layers, as in the patent in suit, but the covering by the pieces in a superimposed layer of the joints of the layer beneath. In answer to the question, "Do I

understand that the edges of the pieces in each layer came together like the edges of bricks and the pieces of the different layers overlapped the joints of the adjacent layers?" he says "Yes," illustrating his answer as follows:

"Supposing we had three pieces of mica, one inch wide and two and a half inches long; you were to put two of those pieces in a line, which would make a line of mica one inch by five inches. The third piece we would put in the center to cover up the joint, and make it appear a solid mass, and so we would continue if we wanted to make a piece a foot long, and then we would consider it as not got a joint."

All of this testimony as to prior use is open to the criticism that the witnesses speak from recollection after a considerable lapse of time, that no specimens of the product of the supposed anticipating use have been produced, and that there is no corroborating testimony from any who have seen the method produced by the witnesses, as testified to. It is unnecessary to repeat here what courts have so often said in regard to this character of testimony. The Supreme Court of the United States, in Cantrell v. Wallick, 117 U. S. 689, 696, 6 Sup. Ct. 970, 974, 29 L. Ed. 1017, said:

"Not only is the burden of proof to make good this defense upon the party setting it up, but it has been held that 'every reasonable doubt should be resolved against him.'"

The mind of the court must be fully satisfied of the existence of the prior use, before it will overthrow the presumption, arising from the grant of letters, that the patentee is the first inventor of the device described, and that the letters patent were issued by the Patent Office with full information as to what had previously been done in the art. A careful examination of the evidence as to prior use, set out in the record, fails to thus satisfy me.

On the question of infringement of the Dyer patent, the testimony seems to me clear and convincing. Walter L. Mitchell, a witness produced by the complainant, testifies that he was in the employ of the defendant company from February, 1901; that he was general foreman of the insulation plant; that as such he "had to attend to splitting, the pasting, and the breaking of the edges of the mica, the making of the sheets and the mixing of the compounds, the steaming of the mica boards, and the pressing, the trimming, the baking and the milling." He particularly describes the training of the girls to split the blocks of mica into their ultimate or elementary laminæ, which were distributed to the pasters, "after which the pasters would take and start to build same upon a wooden table or portion of the table, first varnished with a coating of oily compound, edges of scale mica overlapping one another, the first row of mica scales, which would be larger than the following ones, was then laid upon the varnished table with edges overlapping, each lap being dabbed with a little liquid shellac. After the first row was entirely laid, I would then cover the entire layer of scales of mica with a liquid shellac, and then lay on with the edges overlapping smaller pieces of mica scales. I would keep this up, using mica scales and shellac compound

alternately, until I had about four or five layers of them, after which I would turn the entire sheet over and resume operations the same as I did before turning, namely, first a row of shellac, then a row of mica scales until said sheet attained required thickness, after which it would be removed from said varnished table and placed upon a steam table, the object was to evaporate alcohol, and should I at any time find that a sheet had too much shellac into it, which I invariably did, I would take aforesaid described roller to evenly lay and force out the excessive shellac. After same had been rolled with this hand roller, it would then be removed from steam table and placed between two sheets of tin, the tin having been first treated with a chemical compound and then placed in the steam press, and pressure put on the same of from fifty to one hundred tons, and steam turned on. After same had been steamed for about fifteen minutes, steam would then be shut off and cold water allowed to pass through hollow plates, the object of water was to cool it off or chill it, at the same time to set the sheet being held under pressure. After same had become thoroughly chilled, it was removed from there, and same was marked with an iron gauge, 18 by 36 inches, and rough edges trimmed off, after which it would go to the milling machine."

The various exhibits of artificial insulation sheets made by the defendant company were made under the supervision of this witness, and the process described as to each exhibit. Professor Anthony, complainant's expert, reviews this testimony of Mitchell at length, and gives his reasoned opinion, that the process by which the several exhibits were made, infringed claims 1 and 2 of the Dyer patent. I am satisfied from this testimony, as well as from the testimony of Mitchell himself, that as to these exhibits the defendant company has been guilty of the infringement of claims 1 and 2 of the Dyer patent, as charged in the bill. Mr. Beeken, the defendant's expert, points out what he considers differences in the method practiced by Mitchell for the defendant company and that covered by the first and second claims of the Dyer patent in suit. It is not necessary to discuss here at length this testimony. The differences pointed out are in the main of minor and trifling character, and do not at all affect the substantial identity of the essential steps in the two processes.

The second claim of the Dyer patent, as already quoted, requires brief consideration. It continues the process described in the first claim a step further, that step being, in the words of the claim "the chilling the sheet while rigidly held in a curved position." The process covered by the second claim is clearly a continuous one, and consists in doing all the things set out in the first claim, and then immediately, while the mica sheet is hot and moist, curving it into a required form and then immediately setting it by a chilling and hardening process. This susceptibility of being curved or bent while in a green state, without breaking the texture of the sheet, is due, no doubt, to the capacity of the scales of mica to slide upon each other at their overlapping edges. The

sliding of each scale is, of course, very minute, but sufficient to perform the function of "flowing," which occurs in the bending of metal sheets.

The Jefferson patent, in the words of the patentee, relates to a device especially adapted for molding the mica flanged rings for Gramme-ring armatures. The patentee claims, however, not only the particular molds, but also, in his second claim, "the hereinbefore described process of bending and setting mica sheets, consisting of building a mica sheet by cementing together laminæ of mica scales with overlapping edges, compressing the sheet into the desired form while the cement is wet, drying the cement by evaporating the solvent thereof, and finally chilling the molded sheet while under compression." It appears that Jefferson was the intimate friend and partner of Dyer, and that applications for the two patents were filed upon the same day, although the Dyer patent was first issued. I am of opinion that this second claim, if it is intended to describe a continuous process, through the manufacture of an artificial mica sheet, under claim 1 of the Dyer patent, and the molding of the same while it is yet wet from the said process of manufacture, is covered by the second claim of the Dyer patent. If, however, it is intended to extend further and cover a process by which an artificial mica sheet, after it had been manufactured by the Dyer process and not as a part or continuation of that process, is taken and reheated or remoistened and then molded while under compression, the claim is void, as not involving patentable invention. I think that any one is at liberty to purchase an artificial mica sheet from an authorized vendor, and mold it by a pressure and compression into any shapes of which it is susceptible, just as he may take any other material, such as sheet iron or tin, that is susceptible of being so treated, and mold it into shapes that may be desired. For these reasons, I find the second claim of the Jefferson patent, No. 483,653, and issued October 4, 1892, invalid as to its second claim.

Let a decree be entered in conformity with this opinion.