### WRIGHT v. BROWNLEE et al.

(Circuit Court of Appeals, Third Circuit. April 2, 1914.)

No. 1815.

1. PATENTS (§ 81*)—VALIDITY—PRIOR USE—DEGREE OF PROOF.

One who attacks a patent on the ground of prior use must establish his contention by a high degree of proof.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*]

2. PATENTS (§ 328*)—VALIDITY—PRIOR INVENTION—GAS HEATED SADIRON.

In a suit for the infringement of Wright patent, No. 1,001,331, for a gas heated sadiron, evidence *held* insufficient to establish invalidity on the ground of prior invention.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in equity by George H. Wright against James H. Brownlee and another. From a decree for defendants (205 Fed. 526), plaintiff appeals. Reversed with directions.

R. M. Barr, John Monaghan, and C. N. Anderson, all of Philadelphia, Pa., for appellant.

D. J. McBride, of Philadelphia, Pa., for appellees.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. [1, 2] A reference to the opinion of the District Court reported in 205 Fed. at page 526, will disclose that the decision of this controversy turns wholly upon a question of fact. · Wright's patent is based upon a caveat filed on November 2, 1909, and unless Brownlee has proved his asserted priority of invention the patent must stand. Brownlee contends that the invention is his, that it was made several months at least before the caveat was filed, that Wright gained all his knowledge of the device from seeing Brownlee's patterns and castings, and that he fraudulently used such knowledge for his own private ends. The District Court sustained Brownlee's contention, but we are unable to agree with this view of the evidence. An examination of the record has led us to believe that sufficient weight was not given to the rule that requires a high degree of proof from one who attacks a patent upon the ground of prior use. As it seems to us, the evidence will readily support either of two opposing accounts; each practically depends upon the recollection of witnesses after a lapse of several years without much corroboration from other sources, and in such a situation we think it wise to follow the rule, founded on excellent reason, that regards such testimony with disfavor and requires it to reach a high degree of probability before a court will accept it as fulfilling the measure of proof. The District Court has given us one account of the events referred to, and the other account appears in the opinion of the Board of Examiners in Chief of the Patent Office, which was brought to our attention after we had independently reached the same conclusion. The examiners were deciding an interference proceeding between Wright and Brownlee involving the claims now in dispute, but the interference depended· substantially on the same evidence as is now before us. We append the examiners' opinion as a full and careful statement of our view of the testimony:

"The testimony of neither party conforms very closely to the dates alleged in their preliminary statements. It is shown by the record of both parties that Brownlee had been for a long time experimenting in the construction of gas heated sadirons, which form the subject of the interference. As to when these experiments commenced, the testimony is very conflicting. Brownlee states that he began his experiments in 1887, and again he fixes the date of one of his exhibits in January, 1889, which date he finally changes to 1907, and in his answer he states that for two years after 1907 he did very little in the gas iron business. In his further examination in regard to the times at which certain of the exhibits filed by him were made, he testifies to dates in 1907 and 1908. Also, he fixes the date of Exhibit 3 in January, 1909, and finally he states that he does not know when any of these irons were made.

"The decision of the court and of the examiner of interferences was based principally upon the testimony in regard to Exhibit A of Brownlee, which corresponds exactly to the drawing of the application involved in this interference, and on Exhibit E, which is supposed to have been made at a somewhat later date than Exhibit A.

"Brownlee states that Exhibit A was cast at Bernstein's foundry, and similar castings at other places; that Wright, the senior party, was the foreman at Bernstein's foundry, and he believes and is sure that he gave the pattern from which the castings were made to Wright; that this was about the time that Wright was leaving Bernstein's employ; that he is not sure that Wright was there when the castings were finished; that this was the first time that Wright saw the pattern of or the idea of Exhibit A; that he showed an iron like Exhibit A to Wright in the presence of a party Moseley, about six months after he became acquainted with Wright; and that this was about April, 1909. It will be noted that the date alleged for the disclosure to Moseley is not fixed with relation to any established date or with relation to any important circumstance which could tend to fix it in the mind of the witness, but purely as an act of memory. The only attempt to fix a date for this exhibit with relation to any other circumstance, the date of which it is possible to ascertain, is found in the statement that Exhibit A was made about the time that Wright left the employ of Bernstein. On this point Wright testifies that his time at Bernstein's expired on Thursday evening, between the 1st and 3d of November, 1909; that he engaged with the Philadelphia Iron Foundry Company on Friday morning after leaving Bernstein's. Bernstein states that Wright left his employ November 5, 1909, and Smith, one of the proprietors of the foundry company to which Wright went upon leaving Bernstein's, states that Wright was in his employ from November, 1909, to June, 1910. It may be considered therefore established that Wright left the Bernstein foundry somewhere from the 1st to the 5th of November, 1909, and the making of the castings for Exhibit A, according to Brownlee's own testimony, is fixed at about this time.

"Brownlee further testifies that the patterns for Exhibit A were made by a patternmaker, Lyons, who was called as a witness on his behalf. Being shown Exhibit A and asked if he made the pattern for it, Lyons testifies as follows:

" 'That's the same pattern; this is made off of that (pointing to Exhibit B. Witness is looking at Exhibit A). Now, the only difference is these lugs (witness pointing to three lugs projecting upward from the bottom of Exhibit A), in the corner is a lug taken out of each corner (witness' pointing to the screw lugs in Exhibit B).

" 'Q. 15. Did you make those changes?

" 'A. No, sir.

" 'Q. 16. Then the pattern which you made was the same from which both of these irons were cast with the exception of these changes.

" 'A. Yes, sir.'

"Upon an inspection of Exhibits A and B, it will be seen that Exhibit A is practically the same as Exhibit B, except that a number of lugs upon the bottom of the iron have been added and there are no screw lugs in the corners. This is as stated by the witness. Exhibit A therefore appears to represent a further development of Exhibit B, although Brownlee testifies that Exhibit B was made after Exhibit A. It seems doubtful whether he is correct on this point, and in our opinion the nature of the exhibits indicates that B was first in order. In this view we are supported by the above quotation from the testimony of Lyons, from which it clearly appears that he made the pattern for Exhibit B and that Exhibit A, which has the lugs, was made afterwards, and that he does not know when the changes were made. Brownlee states that he added something himself, but does not say what it was nor when it was added. Lyons therefore fails to establish any date for Exhibit A.

"The decision of the court states that the patterns for Exhibit A were made by a party, Turner, who is also a witness on behalf of Brownlee. It appears from the testimony of Turner that he did considerable work in the making of patterns for gas irons for Brownlee between the dates June 2,

1909, and December 15, 1911; but there is nothing in his book by which it can be ascertained just what work was performed upon any specific date. Testifying from memory, he states that on June 2, 1909, he was employed by Brownlee to alter a pattern for a burner which he says was to be attached to Brownlee's Exhibit A; that he made the alterations in the burner, which consisted in the addition of a lug upon the side of the burner which was to serve as a means of attaching the same to the body of the gas iron; that this change in the burner necessitated a change in the body of the iron by the addition of a loop and set screw which clamped upon the lug on the burner. Turner also states that when the burner was brought to him, as near as he can remember, the iron body pattern was in the foundry, and in order for him to get the same it meant the lapse of a couple of days between orders, which would place the order with the alteration on the body of the iron June 9, 1909. As before stated, there is nothing upon his books by which he can identify the nature of the work; but he describes the burner and the means for clamping it in place in the iron, as shown in Exhibit A, and in the application drawing of Brownlee. Upon being shown Exhibit A and asked if he made any of the patterns for this iron, he states that he duplicated some of the parts of the iron and also made alterations on the body and other parts that had already been made by another patternmaker; that he made a new pattern which was a duplicate of the old burner, the same as in the iron now; and that he did not make the pattern for the body of the iron, which was made by another patternmaker prior to the time he worked on the same. When asked when he first saw the pattern of this Exhibit A, and what was its interior construction when he first saw it, he replied:

"The first time I saw the defendant's Exhibit A, as a complete iron, was on June 14, 1909. The interior construction was identically the same as now. Inside these two wings, projecting forward in the middle of the iron, was another rib. Also, in the interior of the iron forward were little projecting lugs on the bottom of the iron. These ribs and lugs were used to guide the flame. There was also a flame plate as is now in the iron which was used to deflect flame downward on the bottom of the iron. There was also a burner as now seen. This burner was held in position by a backward projecting lug through a cored hole on the side of which was a set screw to hold the burner in position. The alteration I made on the iron and burner pattern was to put the present lug on the burner and also on the back part of the body of the iron which now holds the burner in position.'

"He further testifies:

"'Q. 10. Did or did not Mr. Brownlee at that time show you and Mr. Wright this pattern of defendant's Exhibit A and explain the same to you?

"'A. I was working on this work for Mr. Brownlee at this time. The work I was doing—some slight change in the deflector pattern. When Mr. Wright and Mr. Brownlee came into my place of business, we all examined the iron which is defendant's Exhibit A, and talked about the practicability of the same. There really was no need to talk about this matter from the fact of the point of view, for the iron at that time had been tested and found true.

"'Q. 11. Did or did not Mr. Wright make any comments on this iron at that time?

"'A. Mr. Wright said the iron would be no good as it then stood and advised Mr. Brownlee not to spend any more money to cover his claim on same.'

"In his answer above quoted, Turner would appear to fix the date when he saw Exhibit A as a completed iron as June 14, 1909; but it should be noted that this testimony, of the description of the interior construction of the exhibit and the alteration which he was called upon to make in the patterns, was given with the exhibit in his hands, and it would be very easy to supply from the exhibit itself any construction as to which his memory might be in fault.

"Bearing in mind that the work which Turner was called upon to perform at this time was to add a lug, which is numbered *36* in the application drawings, to the upper side of the burner *32*, and to place upon the body of

the iron a loop, numbered *38*, with an opening 'for the set-screw *39* for clamping the burner upon the iron, attention may be called to the fact that this same construction is found in Exhibit B and also in Brownlee's patent No. 969,033, August 30, 1910, granted upon an application filed September 20, 1909, very shortly after the making of the patterns about which Turner is testifying. In the Brownlee patent the loop and set screw are on the rear end of the deflector *J* instead of upon the rear end of the body, but the deflector is attached to the inside of the body, and the rear end projects to the rear surface of the body bringing the loop on the outside and in the same relation to the body of the iron as in Exhibits A and B. It would therefore be very easy for any one testifying several years after the event, and with Exhibit A in his hands at the time, to testify as Turner did, when, as a matter of fact, the iron shown in the Brownlee patent may have been the one upon which the work was done instead of Exhibit A. There is also another statement ·made by Turner which may indicate that this was the fact, for, in his answer above quoted, it should be noted that at the time Wright and Brownlee came to his shop the work he was doing was some slight change in the deflector pattern, and as the work which he was doing at this time related to the burner attachment, this statement somewhat strengthens the possibility that his entire testimony relates to the iron shown in the Brownlee patent. Without holding whether this·is so or not, it appears to us that in view of the possibilities of confusion as to which of these irons Turner was working upon at this time the force of his testimony is completely destroyed as an identification of Exhibit A and the time at which it was made. Turner also testified, as above quoted, that it was at this time that Wright said that the iron would be no good as it then stood and advised Mr. Brownlee not to spend any more money to cover his claim on the same. Brownlee says that this statement was made after Wright left Bernstein's. The castings for Exhibit A were said by Brownlee to have been made at the foundry of Bernstein and at other places. Bernstein, being called as a witness and shown the various exhibits of Brownlee and Wright, states that he cannot identify these as being cast at his foundry, but can identify them as being the same as being cast at his foundry. He states that Exhibit A, or something similar, was made there; that an iron similar to Exhibit E was made; and that he remembers very well a casting like Exhibit C. He does not fix the date when any of these castings were made, merely testifying that the first castings which were made for Brownlee were made in the year 1907, or early in 1908, and that the last casting was made just prior to Mr. Wright leaving his employ, and that he did not see that iron here at all. Here he is in conflict with Brownlee, who says that Exhibit A was the last iron made prior to that time. Upon being shown Exhibit A and asked if he had ever seen it before, he stated that he had seen a casting 'the same as this' in his foundry. He did not know for whom that casting was made, but states that 'this iron was brought to us later changed, then I knew that it was Mr. Brownlee's iron.' Here, again we find slight indication that it was probably not Exhibit A which he saw, but Exhibit B, for Exhibit A was apparently made from the same patterns as Exhibit B with the addition of certain lugs in the bottom of the iron. There is no further attempt by Bernstein to fix any date for Exhibit A.

"The party Moseley, to whom Brownlee alleges that he showed Exhibit A in the presence of Wright in April, 1909, was called as a witness for Brownlee. He produced books from which it appeared that under the dates of July 6 and July 15, 1909, he made certain castings for flatirons for Brownlee, and, upon being shown Exhibit A, he states that 'this is the pattern that Mr. Brownlee showed to Mr. Wright and myself.' Upon being asked to describe the interior construction of the iron without looking at it, he gives a very superficial description of the same, leaving out the lugs in the bottom of the iron, which are an element of the issues in the interference, and his description would apply to Exhibits B or C, or the Brownlee patent, No. 992,334, or the still earlier Brownlee patent, No. 969,033. In attempting to fix the date of the meeting at Mr. Brownlee's house, when Exhibit A was shown to Wright, he is unable to do so by any documentary evidence, but states that 'it was in the spring, for the flowers were very pretty in the

garden; I remember that it was light evenings.' This may as well have been in the spring of 1910 as in the spring of 1909. We are unable to satisfy ourselves that this testimony is sufficient to establish any date for Exhibit A, or of the time at which Exhibit A was shown to Wright, or that it ever was so shown.

"Exhibits B and C do not satisfy the terms of the issue, but Brownlee testifies that they were made after Exhibit A. He testifies that Lyons made the patterns for Exhibit B and Bernstein the castings, and that the castings were made while Wright was with Bernstein, and some after that time. Lyons testifies that he started to make patterns for Exhibit B in the fall of 1907 and spring of 1908, yet Brownlee, in his preliminary statement, does not allege conception of the subject-matter of Exhibit A prior to January, 1909, and alleges that the castings for Exhibit A were made about the time Wright left the Bernstein foundry. These statements are entirely inconsistent. Brownlee testifies that the patterns and castings for Exhibit C were made in 1907 or early in 1908; that the patterns were made by Lyons and the castings by Bernstein about a month after Exhibit B; and that at that time Wright was out of employment. As Wright did not leave Bernstein's until November, 1909, these dates are also entirely inconsistent. Lyons states that he made the patterns for Exhibit C in the spring of 1908 and shows an entry of $12.75 in his book, which was filed as Exhibit D, and yet we find Turner working on patterns, which he alleges related to Exhibit A, as late as June, 1909. It seems clear that neither Brownlee, Lyons, nor Turner are able to distinguish clearly between the patterns for the several irons and fix correctly the dates at which they were made.

"Exhibit E satisfies the terms of the issue. Brownlee does not testify in regard to this exhibit, but Lyons states that he made the pattern for the same in the spring of 1909, but the only way in which he fixes this date is that it was the last pattern he made for Mr. Brownlee in 1909. When cross-examined as to how he is able to fix this date, he states that he made three body patterns altogether, and that this was the last one made. This testimony is very unsatisfactory, as it is just as reasonable to suppose that he worked upon Exhibits B, C, and the patterns for the Brownlee irons disclosed in Exhibits F and G, patents Nos. 969,033 and 992,334. The only other testimony as to Exhibit E is that of Smith, of the firm of Smith & Hansell, who states that his foundry made castings which looked very much like that for Mr. Brownlee, and that he made castings of this type for Mr. Brownlee in May, 1910. He produces his books and under the date of May 3, 1910, shows a charge for castings made for Brownlee of 25 cents, which bill was receipted for the firm by Wright. Smith does not satisfactorily identify Exhibit E, and as the proprietor of the foundry it seems very unlikely that he would have examined castings with sufficient particularity to have been able to have distinguished Exhibit E from any of the others in the case. None others were shown him, and we are therefore unable to determine whether he was capable of distinguishing one from the other upon casual inspection. The witness Guenther, a clerk in Smith & Hansell's foundry, when shown Exhibit E, also states in about the same way as Smith that he saw castings like this sample in the Smith & Hansell foundry in May, 1910. This testimony also seems to be too vague and uncertain to establish the date of Exhibit E, and we do not find that Brownlee has properly proven any date for the matter in issue prior to the date of Wright's application for the patent involved in this interference. Wright, himself, admits, in the stipulation on page 152 of his record, that he had knowledge of Brownlee's completed gas irons before he filed his application.

"If we are correct in our findings as to the failure of Brownlee to satisfactorily prove the dates of any of his exhibits, it is unnecessary for us to consider Wright's record, etc. * * *

"As the burden of proof in this case is upon Brownlee to prove priority beyond a reasonable doubt, we are compelled to hold that he has failed to sustain this burden and has not satisfactorily shown that the invention was disclosed by him to Wright. It is true that Wright was for a considerable period in such relation to Brownlee as to be familiar with all that he was doing, but he was not employed to invent or assist Brownlee in inventing

anything relating to the irons. He was merely the foreman of a foundry to which Brownlee brought his patterns in order to have castings made therefrom, and while there is always a presumption, where it is impossible to determine what each party has done, that the invention was made by the employer and that any addition made to the invention by the employé inures to the benefit of the employer, yet in such cases it must be shown that the employer had at least the main plan of the invention. In the present case it has not been shown that Brownlee disclosed to Wright anything more than the construction upon which he has already obtained patents, and some of the features involved in the issue are also old in references cited in the case, which were patented long before any work was done by Wright. It would be too harsh a rule to hold that, because the foreman of a foundry saw the castings made for an inventor, he should not interest himself in the general subject to which these inventions relate and do any independent work in that line without raising a presumption that he had derived the invention from his customer.

"For the reasons stated, we reverse the decision of the examiner of interferences and award priority of invention to George H. Wright, the senior party."

As already stated, this account seems to us more probable than the view adopted by the District Court; but, even if we stated the question in the form most favorable to Brownlee, the best that can be said is that two equally probable accounts find support in the evidence.

The decree is reversed, with instructions to the District Court to enter a decree in favor of complainant.