SEARCHLIGHT HORN CO. v. VICTOR TALKING MACH. CO.

(District Court, D. New Jersey. October 22, 1919.)

1. JUDGMENT ⬥675(1)—CONCLUSIVENESS OF DECREE FINDING PATENT VALID AND INFRINGED.

A final decree, finding a patent valid and infringed, rendered in a suit against a purchaser from defendant, which manufactured the alleged infringing articles, is a conclusive adjudication as to those matters binding on defendant, where defendant participated in the litigation and its counsel openly conducted the defense.

2. PATENTS ⬥22—MECHANICAL EQUIVALENTS.

The doctrine of mechanical equivalents can be invoked in all patents.

3. PATENTS ⬥99—FOR HORN FOR PHONOGRAPHS VALID.

A patent for a device which performs a novel and useful function, as a patent for a horn for phonographs which did away with the annoying tintinnabulations, is entitled to protection, where the specifications disclose the method, even though the inventor is ignorant of the scientific principles involved.

4. PATENTS ⬥328—FOR METAL HORN FOR PHONOGRAPHS VALID.

The Nielsen patent, No. 771,441, for a metal horn for phonographs, made of longitudinally connected strips of metal, held valid, doing away with the annoying vibrations and tintinnabulations of other horns.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. PATENTS ⬤⟹81—PRIOR USE.
   Oral testimony as to prior use of a patented device should be scrutinized most carefully.

6. PATENTS ⬤⟹81—PRESUMPTIONS IN FAVOR OF VALIDITY.
   Every reasonable doubt should be resolved against one attacking the validity of a patent, particularly when the attack is based on oral evidence of facts long past relied on to prove prior use.

7. PATENTS ⬤⟹62—PROOF OF ANTICIPATION.
   Anticipation of a patent should be established, not merely by testimony of witnesses relating to facts many years previous, but by concrete, visible, contemporaneous proofs, and the proof must establish a clear conviction, and something more than oral testimony, even of the highest character, is required, when there has been a considerable lapse of time.

8. PATENTS ⬤⟹328—FOR HORNS FOR PHONOGRAPH NOT ANTICIPATED.
   The Nielsen patent, No. 771,441, for horns for phonographs, *held* not invalid on the grounds of anticipation and prior use.

9. ESTOPPEL ⬤⟹52—WHAT CONSTITUTES EQUITABLE ESTOPPEL.
   Where a person, by anything which he does or says, or abstains from doing or saying, when it is his duty to act or speak in respect of a subject-matter, intentionally causes or permits another person to believe a thing to be true, and to act upon such belief otherwise than he would have acted, but for that belief, and he so acts, and materially changes his position in respect of the matter to his detriment, then the first person is not allowed, in a suit between himself and such other person, to deny the truth of the thing done or stated.

10. PATENTS ⬤⟹289—DELAY IN PROSECUTING OTHER INFRINGERS NOT LACHES.
    Delay in prosecuting other infringers while the validity of a patent is in active litigation does not constitute laches.

11. PATENTS ⬤⟹289—DELAY IN PROSECUTING FOR INFRINGEMENT NOT LACHES.
    Where the owner of a patent promptly protested against infringement, and the infringer was in no way misled or induced to change its position, several years' delay in instituting suit for infringement of a patent does not constitute laches, which will bar relief; it appearing during a considerable period of the time negotiations for settlement were continued between the parties, and the owner of the patent, before suing, established the validity of the patent in litigation against others.

In Equity. Bill by the Searchlight Horn Company against the Victor Talking Machine Company. On final hearing. Decree for complainant.

John H. Miller, of San Francisco, Cal., and Frederick S. Duncan, of New York City, for plaintiff.

Fenton & Blount, of Philadelphia, Pa., for defendant.

DAVIS, District Judge. The complainant in this suit seeks to restrain the defendant from making, using, or selling phonograph horns infringing claims 2 and 3 of its patent No. 771,441, issued to Peter C. Nielsen October 4, 1904, which by mesne assignments came into the possession of the complainant. It further seeks the profits realized by defendant and damages sustained by complainant on account of said infringement.

·· The defendant denies liability on the ground that: 1. It did not infringe "under any permissible interpretation of the patent." 2. That the claims of the patent, if not wholly invalid, are entitled to a narrow construction only by reason of: (1) Prior art patents and publications

and prior state of the unpatented art; (2) the descriptive disclosure of its metes and bounds, apparent on the face of the patent; and (3) the acts and declarations of the patentee appearing in the file and contents of the application for it, operating to further limit the disclosure in the patent. 3. Complainant is guilty of laches.

[1] The complainant urges that none of these questions may be raised in defense, because they have been passed upon by the United States Circuit Court of Appeals for the Ninth Circuit in the case of Searchlight Horn Co. v. Sherman, Clay & Co., 214 Fed. 86, 130 C. C. A. 562, and the judgment has become final. It appears that the defendant company sold to Sherman, Clay & Co. phonograph horns which infringed claims 2 and 3 of the patent in question. The suit was defended by the Victor Talking Machine Company, defendant in this case; its own counsel openly conducting the litigation. Final judgment, unappealed from, was entered in that case, sustaining the validity of claims 2 and 3. This judgment was properly pleaded in the case at bar. There is no question that the Victor Company openly and avowedly defended the suit in behalf of its vendee. The same question, the validity of the second and third claims of the patent, was at issue there as here, and substantially the same defenses raised and adjudicated, and under these circumstances the final judgment there is conclusive here, and the question here is res judicata. Bemis Car Box Co. v. J. G. Brill Co., 200 Fed. 749, 119 C. C. A. 229; David Bradley Mfg. Co. v. Eagle Mfg. Co., 57 Fed. 980, 6 C. C. A. 661; Cushman v. Warren-Scharf Asphalt Paving Co., 220 Fed. 857, 135 C. C. A. 289; Elliott v. Roto et al., 242 Fed. 941, 155 C. C. A. 529; Souffront v. La Compagnie Des Sucreries, 217 U. S. 486, 487, 30 Sup. Ct. 608, 54 L. Ed. 846. As Judge Buffington, under a similar situation, said in the Bemis Car Box Co. Case, supra:

"On well-established principles it is clear that all the questions involved in that issue were, as between the parties to such litigation, merged and concluded in the final decree therein entered. The validity of the claim therefore became res judicata."

[2] The facts in the case at bar bring it within the decision just quoted which is dispositive of this case. I will, however consider the case upon its merits, so that it may not be necessary to send the case back for that purpose, if the appellate court should reach a different conclusion upon the question of res judicata.

Claims 2 and 3 of the patent at issue here are as follows:

"2. A horn for phonographs and similar machines, the body portion of which is composed of longitudinally arranged strips of metal provided at their edges with longitudinal outwardly directed flanges whereby said strips are connected, and whereby the body portion of the horn is provided on the outside thereof with longitudinally arranged ribs, said strips being tapered from one end of said horn to the other, substantially as shown and described.

"3. A horn for phonographs and similar instruments, said horn being larger at one end than at the other and tapered in the usual manner, said horn being composed of longitudinally arranged strips secured together at their edges and the outer side thereof at the points where said strips are secured together being provided with longitudinal ribs, substantially as shown and described."

The defendant contends that it does not infringe the patent because the method of joining the strips composing the body portion of the horns is limited to the butt seam and excludes the lock seam, used by the defendant.

These phonograph horns "were composed of metal strips joined together along their longitudinal edges by means of outwardly directed flanges. * * * This method of connecting the strips consisted in bending portions of the metal outward along the longitudinal edges at a right angle to the body portion of the strips of metal. The two outstanding flanges thus formed were then placed together and held securely and rigidly in place by means of solder" or in some other way. This was the butt seam. There were two kinds of seams well known in the art of joining two pieces of metal together at the time of the Nielsen invention. The butt seam has already been described. The other was the lock seam, which was made—

"by bending portions of the metal outward along the longitudinal edges thus forming flanges, one of which was made longer than the other. The longer flange was then bent down over the shorter and the interlocked flanges thus formed were then flattened down upon themselves and upon the body of the horn, forming a rib or seam on the outside thereof." Sherman-Clay & Co. v. Searchlight Horn Co., 214 Fed. 86, 130 C. C. A. 562.

Complainant contends that these seams are mechanical equivalents, performing substantially the same function in substantially the same way, that the doctrine of mechanical equivalents may be invoked in defense of the patent, and that either way of uniting the sections of the horn would be a substantial compliance with the requirements of the patent. The longitudinal outwardly directed flanges are to be so "connected" that the body portion of the horn will be provided on the outside thereof with longitudinal ribs. The drawings of the patent show the butt seam only. It is stated in the specification and claims that the longitudinal strips are provided with outwardly directed flanges whereby the said strips are "connected" without specifying in what way they are to be "connected." Since the butt seam and lock seam were both well-known methods of joining pieces of metal long before the Nielsen invention, and it is provided in the patent that "changes in and modifications of the construction described may be made without departing from the spirit of my invention or sacrificing its advantages," the two kinds of seams are mechanical equivalents. The lock seam may be used in substantial compliance with the terms of the patent and the limitations, excluding the lock seam, sought to be imposed by counsel for defendant as a consequence of the disclosures of the file wrapper are not justified. The doctrine of mechanical equivalents may be invoked in all patents. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 413, 28 Sup. Ct. 748, 52 L. Ed. 1122; Winans v. Denmead, 15 How. 330, 14 L. Ed. 717.

[3, 4] The object of the Nielsen patent—

"is to provide a horn for machines of this class which will do away with the mechanical, vibratory, and metallic sound usually produced in the operation of such machines, and also to produce a full, even, and continuous volume of sound in which the articulation is clear, full, and distinct." "The body portion of the horn is also composed of a plurality of longitudinal strips, which

are gradually tapered from one end to the other, and which are connected longitudinally, so as to form longitudinal ribs $b^2$, each of the strips $b$ being provided at its opposite edges with a flange $b^3$, and these flanges of the separate strips $b$ are connected to form the ribs $b^2$, * * * and it is the construction of the body portion of the horn as hereinbefore described that gives thereto the qualities which it is the objects of this invention to produce, which objects are the result of the formation of the horn or the body portion thereof of the longitudinal strips $b$ and providing the outer surface thereof with the longitudinal ribs $b^2$, * * * and it is the longitudinal ribs $b^2$ which contribute mostly to the successful operation of the horn; said ribs serving to do away with the vibratory character of horns of this class as usually made, and doing away with the metallic sound produced in the operation thereof."

We are not told just how the longitudinal ribs $b^2$ contribute to the successful operation of the horn, the "elimination of vibration and resultant metallic sound," whether as a "seam and strengthening ribs," or as a means of decreasing the amplitude of the vibratory waves. In either case, the lock seam would perform the same function in substantially the same way as the butt seam.

The defendant claims in effect that there was no problem of vibration or metallic resonance to get rid of, and, if there was, Nielsen did not do it. After the Nielsen patents were granted, and the horns constructed thereunder were put upon the market, they were sooner or later adopted by the great majority of persons in the horn business. The witness Krabbe said:

"During the latter part of 1904, and for a number of years succeeding, it [the Nielsen horn] was practically the only metal horn used and was used in numerous quantities."

Merritt said:

"By the latter part of 1904 or the early part of 1905, practically every horn manufacturer, in the East, at any rate, was making this type of horn. They at once superseded both the brass horn and the B. & G. horns, as well as the paper horns that had previously been put upon the market in some quantity."

Lock said:

"The so-called flower horn created a furore, and practically did away with the B. & G. horn. All new trade was in the flower horn, and many people, who had previously equipped their machines with the B. & G. horn, discarded them and bought the flower horn."

These facts are not denied. The reasons for this general adoption of the Nielsen horn are, however, in dispute. At the time the patent was granted to Nielsen, and until two or three years thereafter, the large phonograph companies, such as the Victor and Edison, sold with each phonograph a small horn, which was generally discarded by the purchaser, who equipped the phonograph with a larger horn. In 1906 the Victor Company adopted the Nielsen horn, and supplied each machine sold with the horn, selling the phonograph and horn together. It denies that this was because of the elimination of the so-called mechanical, vibratory, and metallic sound, or tintinnabulation, and alleges that it was solely on account of the superior beauty and artistic effect of the Nielsen horn. I am not convinced that the artistic effect of the Nielsen horn alone accounts for its adoption. In fact, it seems not to have been the case with the Edison Company, which makes the

same defense in that respect as the Victor Company. It appears that in the case of that company the small conical-shape horn supplied with its phonographs was unsatisfactory, and it concluded to discard that horn and secure a better one.

A committee was appointed to examine and test the various horns, and select one to be attached to and sold with the Edison phonograph. This committee consisted of nine persons connected with the company, who were experts in their respective departments. They were W. E. Gillmour, president and general manager; William Pelzer, vice president; Leonard McCheeney, head of the advertising department; Walter Miller, manager of the recording department; C. H. Wilson, sales manager; F. Dolbeer, credit manager; Peter Weber, general superintendent; A. C. Ireton, assistant sales manager; and Walter Stevens. This committee invited all the horn manufacturers to submit samples for test, and during a period of over a month "they tested all types of horns then on the market." I quote from page 78 of the plaintiff's brief, which substantially states the testimony:

"These tests were exceedingly thorough. The horns were numbered and attached to machines concealed behind a curtain, so that when a horn was being used the committee did not know what particular horn it was. The horns were tested in sets of twos, and the one which proved inferior was eliminated, while the one which proved superior was set aside for tests with other horns. In this way all the horns were tested, and by this process of elimination only two horns remained at the final wind-up. Those two horns were (1) the all-brass horn of the prior art; and (2) the flower horn of the shape of 'Complainant's Exhibit X' (Pelzer, qq. 17, 21, p. 763, Edison D. R.), and shown in Edison's advertisements of December 15, 1907, and January 15, 1908, in Talking Machine World (Dolbeer, R-xq. 87, pp. 823, 824, Edison D. R.). That horn, it is needless to say, was a Nielsen flower horn. As between these two horns the committee discarded the all-brass horn and adopted the Nielsen flower horn. The result was reported to Mr. Edison (Pelzer, R-xq. p. 760, Edison D. R.), and thereupon the Nielsen flower horn was adopted as part of the standard equipment of the Edison phonograph."

It does appear, therefore, that the Nielsen horn in the opinion of the Edison Company was adopted because of its superior tone quality, and not because of its artistic effect only, and I have no doubt that the tone quality contributed in some measure, at least, to its adoption by the Victor 'Company. The scientific theory of the Nielsen invention, accounting for its superior tone, is alleged by the plaintiff to be:

"The mechanical vibration of the metal sections of the Nielsen horn are of such small amplitude, in comparison with the vibrations of the prior horns, as to practically do away with, or at least so minimize as to render inaudible, the harsh, squeaky, metallic sounds found in the horns of the prior art, and which the Court of Appeals has denominated metallic resonance or tintinnabulation."

This theory may or may not be true. It is not necessary that the scientific principle be explained, or that the inventor should know it, if the thing to be done is so set forth that it can be reproduced. "An inventor may be ignorant of the scientific principle, or he may think he knows it, and yet be uncertain, or he may be confident as to what it is, and others may think differently. All this is immaterial, if by the specifications the things to be done are so set forth that it can be reproduced." Andrews v. Cross (C. C.) 19 Blatchf. 294, 305, 8 Fed. 269,

278; Eames v. Andrews, 122 U. S. 40, 56, 7 Sup. Ct. 1073, 30 L. Ed 1064. The thing to be done is so set forth in the Nielsen specifications that it may be reproduced. Whether or not the theory is correct, efforts had been made for some time to get rid of the vibration of the horn itself. Mr. Edison wrapped the horn with tape or rattan. Hawthorne and Sheble covered the outside of their horns with a silk material. These proved unsatisfactory. The Nielsen horn, whether or not doing away with the tintinnabulation altogether, must have been an improvement over all other horns in the market at that time, and doubtless was the best that could be secured. The immediate popularity and extensive use of the Nielsen horn created a presumption in favor of its novelty and utility. The conclusion is based both on the adoption of the horn generally, and upon statements issued by the defendant company to the effect that the horn was superior in tone quality to all others.

[5-8] The defendant denies liability because of prior use and anticipating patents. It relies upon oral testimony largely to establish prior use. The proof of prior use by oral testimony should be scrutinized very carefully. At best such method of proof is unsatisfactory. Forgetfulness, liability to mistakes, the power of psychological suggestion, innate tendency to remember what those calling witness desire, possible bias, prejudice, interest, or perjury, all suggest the wisdom of the rule requiring the defendants to prove prior use beyond a reasonable doubt by clear and convincing testimony. Every reasonable doubt should be resolved against one attacking the validity of a patent. The necessity of this rule is emphasized when the attack is based upon oral testimony alone of facts long past. The law requires not conjecture, but certainty. Anticipation should be established, not merely by testimony of witnesses relating to facts many years previous, but by concrete, visible, contemporaneous proofs, which speak for themselves. The proof must establish a clear conviction, and something more than oral testimony, even of the highest character, is required, where there has been considerable lapse of time. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657; Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153; Mack v. Spencer Optical Mfg. Co. (C. C.) 52 Fed. 821; Edison Electric Light Co. v. Beacon Vacuum Pump & Electrical Co. (C. C.) 54 Fed. 678; Pratt v. Sencenbaugh (C. C.) 64 Fed. 780; Mast, Foos & Co. v. Dempster Mill Mfg. Co., 82 Fed. 332, 27 C. C. A. 191; Brown v. Zaubitz (C. C.) 105 Fed. 242; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 703, 45 C. C. A. 544; Young v. Wolfe (C. C.) 120 Fed. 958; Pettibone Mulliken Co. v. Pennsylvania Steel Co. (C. C.) 133 Fed. 735; Mica Insulator Co. v. Union Mica Co. (C. C.) 137 Fed. 938; Koerner v. Deuther (C. C.) 143 Fed. 548; Emerson & Norris Co. v. Simpson, 202 Fed. 747, 121 C. C. A. 113; Keasbey & Mattison Co. v. Philip Carey Mfg. Co. (C. C.) 139 Fed. 576; Interurban Co. v. Westinghouse, 186 Fed. 168, 108 C. C. A. 298; De Laval Separator Co. v. Iowa Dairy Separator Co., 194 Fed. 425, 114 C. C. A. 385; Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co. (D.

C.) 205 Fed. 745; Hopewell v. Linscott Supply Co. (D. C.) 205 Fed. 759; Kryptok Co. v. Stead Lens Co. (D. C.) 207 Fed. 87; Electric Storage B. Co. v. Philadelphia Storage B. Co. (D. C.) 211 Fed. 154; Wright v. Brownlee, 212 Fed. 157, 129 C. C. A. 13; Diamond Patent Co. v. S. E. Carr Co., 217 Fed. 400, 133 C. C. A. 310; Wayman v. Louis Lipp Co. (D. C.) 222 Fed. 679; Salt's Textile Co. v. Tingue (D. C.) 227 Fed. 116; Pieper v. White, 228 Fed. 31, 142 C. C. A. 486.

The defendant seeks to establish prior use in the city of Pittsburgh during the years from 1893 to 1898. A German tinsmith, C. Otto Hammer, made and sold about 150 horns to one Joseph M. Schaefer, a jeweler, from time to time from 1893 to 1898, and to one Kleber, or Kleber Bros., from 1896 or 1897, for about six months. Both Hammer and Schaefer are dead, and there are no records extant, if there were ever any, of the alleged transactions between these persons. The facts depend entirely upon oral testimony of Adolph Hammer, son of C. Otto Hammer, who, at the time he alleges he helped make these anticipating horns, was about 10 years old, and 15 other witnesses. His testimony was mostly elicited by leading questions, was in many respects contradictory, and upon the whole does not produce that clear conviction that satisfies beyond a reasonable doubt. The testimony of the other witnesses is of the same general character as that of Adolph Hammer. They contradict themselves again and again, and also contradict one another. They, unaided by counsel, had practically no definite, fixed ideas of the Hammer horns which they attempted to describe. They contradict one another in very essential matters. They produced no concrete, visible, contemporaneous proof, which spoke for itself, to show that the Nielsen horn was anticipated by the Hammer horns in Pittsburgh. They had lived 15 to 20 years after seeing what they allege they saw, and during that period they had seen many Nielsen horns in the various stores, shops, and homes in Pittsburgh, and some were selling or had sold the horns and phonographs of the Victor and other companies, and might have confused these with the Hammer horns. The witnesses, or some of them, at least, were brought together from time to time before they testified. They signed affidavits prepared for them. They were shown the horns constructed by Adolph Hammer for use in this suit. They were asked if the horns they had seen Hammer make were like these, etc. The result was inevitable. As a matter of fact, there was no reason to fix the time, place, and circumstances under which they first saw those horns. Memory is so fleeting and the human mind so susceptible to psychological suggestions, which need not necessarily be made or received with corrupt motives, that it is utterly unsafe to accept such testimony as a sufficient basis upon which to predicate prior use. This is true, even of witnesses of the highest integrity and intelligence. To base a decree of invalidity upon facts sought to be established by such testimony would inevitably result in a miscarriage of justice. Judge Van Fleet in the Northern district of California, in passing upon the testimony of the Pittsburgh witnesses, said:

"I think it is entirely referable to that readiness of the mind in man, in considering past events, to adopt suggestions as to time, place, and circum-

stances, and dwell upon it to an extent which will enable and induce any of us in many instances to believe that the fact is as we testify it to be. That is not perjury—that simply grows out of the frailty of the human mind and memory. It is wholly impossible for me to bring my mind to the conclusion, with the evidence produced from these witnesses as to the number of these horns that are claimed to have been manufactured—I do not care, as I said a few moments ago, whether it was 50, or 100, or 150—but it is utterly inconceivable, in view of the avidity and unanimity with which this so-called flower horn was subsequently seized upon by the trade, when it was produced under the Nielsen patent, to believe that had it had a previous history of the magnitude which it has undertaken to show, that it would not have filled the same want that was being felt by the trade as it did subsequently."

What has been said of the attempt to establish prior use at Pittsburgh applies to the same defense sought to be established by the same character of testimony in the aluminum horn accompanying the Graphophone Grand machine.

The Tea Tray horn, relied upon by the defendant to invalidate the patent, is composed of a body part and an attached bell, both of conical shape and joined together by a circumferential seam. The Nielsen patent is composed of longitudinally arranged strips, running from end to end of the horn. There are points of resemblance in parts of the horns, but, when considered as a whole, they are very different in appearance and structure, and the Tea Tray 20-inch horn cannot be said to have anticipated the Nielsen horn, when the claims of the latter are read and interpreted in connection with the specifications and drawings.

The Villy patent is also relied upon by the defendant. The horn was made of a series of strips of paper, wood, linen, or other preferably flexible material secured together by a hingelike connection. Judge Morrow, in the case of Sherman-Clay & Co. v. Searchlight Horn Co., 214 Fed. 86, 130 C. C. A. 562, correctly differentiated these patents:

"In substance, the claims of the patent were for a collapsible, but self-sustained, phonograph horn, ear trumpet, or the like, composed of a number of flexible strips having curved meeting edges and flexible connections between such edges. In brief, the great object of the Villy patent was a horn made of strips of flexible material joined by means of flexible connections at the edges in such manner that the whole would be collapsible. There was not involved in the Villy patent, as in the horn described in the Nielsen patent, the problem of preventing tintinnabulation or metallic resonance; and, indeed, in a horn composed of strips of paper, wood, linen, or other flexible material such as Villy proposed to use in the structure of his horn, no precautions against tintinnabulation would, in the nature of things, have been necessary. In the material of which the strips were to be made, the method by which they were to be joined, and in the primary object to be attained, the Villy and the Nielsen horns were vastly dissimilar."

The very genius, according to the inventor of the Turpin horn, relied upon by the defendant to establish prior use, consisted in the material, wood, of which the strips were composed. As was said of the Villy patent, in the material of which the sections are composed, and in the method by which they were joined together, the Turpin and the Nielsen horns are vastly dissimilar.

The dissimilarity in one respect or another of all of the many anticipating horns introduced by the defendant is so marked as to disprove the purpose of their introduction. I have considered specifically

the more prominent ones, and those especially relied upon, and it would serve no useful purpose to analyze the horns further, when it is apparent that they can have but one result.

It is not contended by the defendant that its horns differed in any material respect from the Nielsen horns, except in the manner of joining together the strips of metal of which they were composed, the Nielsen patent illustrating the butt seam, and the defendant using the lock seam; but these seams are mechanical equivalents as before stated.

[9-11] The defendant claims that the plaintiff is estopped from receiving the relief sought because of laches. Equitable estoppel may be defined as follows:

"Where a person, by anything which he does or says, or abstains from doing or saying, when it is his duty to act or speak in respect of a subject-matter, intentionally causes or permits another person to believe a thing to be true, and to act upon such belief otherwise than he would have acted, but for that belief, and he so acts and materially changes his position in respect of the matter to his detriment, then the first person is not allowed, in a suit between himself and such other person, to deny the truth of the thing done or stated."

This is a fuller statement of—

"that great maxim of justice, which declares that he who is silent when conscience required him to speak shall not be permitted to speak when conscience requires him to be silent." Besson v. Eveland, 26 N. J. Eq. 468, 472.

Mere lapse of time alone is not sufficient to establish laches. Columbia Graphophone Co. v. Searchlight Horn Co., 236 Fed. 135, 149 C. C. A. 345; Taylor v. Sawyer Spindle Co., 75 Fed. 301, 22 C. C. A. 203; Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 Fed. 137, 53 C. C. A. 341; Empire Cream Separator Co. v. Sears-Roebuck & Co. (C. C.) 157 Fed. 238; Valvona-Marchiony Co. v. Marchiony (D. C.) 207 Fed. 386; Davis v. A. H. Reid Creamery & Dairy Supply Co. (C. C.) 187 Fed. 157; Benthall Mach. Co. v. National Mach. Corporation (D. C.) 222 Fed. 918; Drum v. Turner, 219 Fed. 188, 135 C. C. A. 74; Eagle White Lead Co. v. Pflugh (C. C.) 180 Fed. 579; Id., 185 Fed. 769, 107 C. C. A. 659; Armstrong Cork Co. et al. v. Ringwalt Linoleum Works, 240 Fed. 1022, 153 C. C. A. 665; Rhinehart v. Victor Talking Machine Co., 261 Fed. 646 (memorandum of Judge Haight). Long acquiescence, however, in the infringement of the exclusive right conferred by the patent will bar the enforcement of the exclusive rights. Acquiescence may sometimes be inferred by delay, as Judge Rellstab said in the case of Eagle White Lead Co. v. Pflugh, supra, but—

"the delay must be attended with such circumstances that acquiescence of the use by another is inferred. There must be either a waiver or an abandonment of rights."

In the instant case the defendant adopted the Nielsen horn as a part of the phonographic equipment, and began to sell the horn and phonograph together about the middle of the year 1906. On May 7, 1906, the defendant was notified of the violation of the Nielsen patent by B. C. Stickney, counsel for United States Horn Company, by a letter which reads as follows:

"My clients, the United States Horn Company, have informed me that you have been engaged in the manufacture and sale of horns for phonographs, in violation of United States letters patent to Villy, No. 12,442 (reissue), dated January 30, 1906, and to Nielsen, No. 771,441, dated October 4, 1904, which patents are their exclusive property, and they have requested me to notify you, in their name, of this infringement, and to request you to promptly desist from further infringement, and pay over to them all profits, gains, and advantages which you have derived from such manufacture and sale, as well as damages which my clients have suffered by reason thereof, and in default thereof they have instructed me to take steps to fully protect their rights in the premises."

The company was also notified orally from time to time of the infringement of the patent, and that all infringers would be required to account to the owner of the patent. The testimony establishes beyond a doubt that the defendant knew that the owners of the Nielsen patent claimed that it was being infringed in the manufacture, use, and sale of the horn in question, and that in the purchase and sale of the horn defendant relied upon the advice of its attorney that the patent was valid. One suit was instituted against the Nova Company in 1905, and judgment was taken in that case by default. Suit was instituted by the present plaintiff against Sherman, Clay & Co. in September, 1911. From the time the company adopted the Nielsen horn as a part of its phonographic equipment in 1906, until 1909, there were some negotiations, between the owners of the Nielsen patent and the defendant and other companies, looking toward the settlement of the case; but in 1909 the negotiations were concluded, and it was definitely settled that no adjustment between the owner of the patent and the defendant company and others could be made. From the time of the infringement until the suits were actually instituted against Sherman, Clay & Co. and the Columbia Company, the owners of the patent failed to institute proceedings. This failure was due, in part, to their financial inability, and in part to the existence of negotiations looking toward the adjustment of the case, whereby royalties might be paid to them. Poverty alone may not be a sufficient excuse for a long delay in asserting rights under the patent, but delay in prosecuting other infringers while the validity of the patent is in active litigation does not constitute laches. Stearns-Rogers Mfg. Co. v. Brown, 114 Fed. 945, 52 C. C. A. 559; Tompkins v. St. Regis Paper Co., 236 Fed. 221, 225, 149 C. C. A. 411. The delay in prosecuting the defendant for alleged infringements from the time it adopted the Nielsen horn as a part of its phonographic equipment and sold it therewith until the institution of proceedings against Sherman, Clay & Co. and the Columbia Company, especially in view of the fact that some negotiations were going on and efforts being made to induce the companies to pay royalties, is not such an unreasonable delay as to constitute equitable estoppel. At no time did the owners of the patent acquiesce in the infringement by the defendant or others. The evidence does not show that the defendant was in any way misled by the complainant or its assignors.

The only charge looking toward laches, which the defendant can bring against complainant or its assignors, is that, notwithstanding notification, written and verbal, proceedings were not actually instituted against it. The defendant, however, cannot complain of this,

because the business which it thus built up was not a new and independent business based upon the horn trade. The horn business was simply an adjunct and addition to its phonographic trade, which it had already established among the jobbers throughout the country, and instead of sending a phonograph without the horn, it added the horn to the phonograph and increased the price accordingly, thus reaping the benefit of the addition of the horn. It may well be that after the adoption of the horn by the defendant company, and before the institution of proceedings against it, or Sherman, Clay & Co., the phonographic business, including the horn of the defendant, was extended, in that the demand for natural reasons for phonographs thus equipped was greater among the jobbers, which the defendant had been supplying; and it also may well be that the invention of the Nielsen horn eliminated the mechanical vibratory and metallic sound, or tintinnabulation, and thus made the entire phonographic business more popular, and thereby increased the revenue of the defendant generally in its phonographic trade. This is, in substance, the theory of the complainant, and the literature of the defendant company and other companies, if taken to be true statements generally, with due allowance for "puffing" their business, would seem to force this conclusion.

In any event, it has not been shown that the defendant was actually misled by any act or statement, or even relied upon any of the complainant or its assignors to its disadvantage. Neither has it been shown that the failure of the complainant or its assignors to begin litigation against the defendant or other companies sooner, of which the defendant now complains, in any way resulted to the disadvantage of the defendant. The defendant sold the infringing horns during a period of their popularity and until cabinet machines were introduced. It now claims in effect that, because it was not prevented from reaping the harvest when it was ripe, it should not be called upon to account for these profits, or any part thereof. Under all the facts in the case, this contention cannot prevail.

The Nielson horn was both new and useful, and therefore patentable. The claims in question are valid, and it follows that the prayer of the complainant as to profits and damages should be granted. The defendant no longer purchases or sells the Nielsen horn, and injunctive relief is not called for.