KEASBEY & MATTISON CO. v. PHILIP CAREY MFG. CO. et al.

(Circuit Court, S. D. New York.   July 6, 1905.)

1. PATENTS—EVIDENCE OF INVENTION—PUBLIC ACQUIESCENCE.

Acquiescence by the public in a patent for almost its entire life, while not conclusive, is persuasive evidence of its validity, and is entitled to great consideration, somewhat approximating that accorded to a prior adjudication.

2. SAME—ANTICIPATION.

Anticipation is not shown by broad and general language in prior patents, although, interpreted in the light of the later invention, it may be said to include the same.

3. SAME—AMENDMENT OF APPLICATION.

An applicant for a patent has the right to alter and amend his specification to conform to the state of the art as the facts are developed in the Patent Office, so long as he does not, by enlarging its scope, appropriate prior inventions, or any that have in the meantime gone into public use; and he may also amend his claims to conform more closely to the specification and drawings.

4. SAME—INFRINGEMENT—COVERING FOR STEAM PIPES.

The Hanmore patent, No. 545,843, for a nonconducting covering for steam pipes, etc., made of a composition which includes as its nonconducting element a major proportion of carbonate of or calcined magnesia and a sufficient quantity of fibrous material, such as asbestus fiber, to bind it together, discloses invention, and was not anticipated nor rendered void by prior public use. Also *held* infringed.

In Equity.   Suit for infringement of patent.   On final hearing. See 113 Fed. 432.

For opinion denying motion for preliminary injunction, see 110 Fed. 747.

William A. Jenner and Edward K. Jones, for complainant.

William Houston Kenyon, William C. Witter, and Edmund L. Mooney, for defendants.

COXE, Circuit Judge.   This is an equity action for the infringement of letters patent No. 545,843, granted July 20, 1886, to Hiram H. Hanmore, for an improvement in nonconducting coverings or jackets for steam pipes, steam boilers and other heated vessels or conduits.   The invention was conceived in the autumn of 1885 and the application was filed January 19, 1886.   Pending the litigation, July 20, 1903, the patent expired.

The complainant's title is not disputed.   The specification asserts that prior to the invention steam pipes, etc., were commonly covered with nonconducting material in order to prevent the radiation of heat outwardly and to conduce to the economical operation of apparatus comprising such elements.   The patentee found that carbonate of or calcined magnesia is one of the best nonconducting materials which can be made use of for such purposes and the invention relates to coverings·which include carbonate of or calcined magnesia as an essential element.   The specification continues as follows:

"The invention consists in a nonconducting covering or jacket composed of molded tiles or sections of a composition which includes as its nonconducting

element a major proportion of carbonate of or calcined magnesia, and which also includes a sufficient quantity of fibrous material—such as asbestus fiber—to bind the magnesia together. the magnesia in any case forming of itself the principal nonconducting element of the composition.

"The invention also consists in a nonconducting composition composed of a major proportion of carbonate of or calcined magnesia, which forms of itself the principal nonconducting element of the composition, and a minor proportion of asbestus fiber sufficient to form a binding material for the composition and prevent the same from cracking."

The specification states further that the invention may be embodied in tiles or sections of any shape suited to the exterior of any vessel or pipe which they are intended to cover. The drawings show these tiles in flat and semicircular form, their essential element being carbonate of or calcined magnesia. They may also comprise any suitable fibrous material, such as animal hair, wool and asbestus, which will bind the magnesia together and protect it against fracture. A small quantity of plaster of paris may also be employed in the composition, but the proportions of magnesia, fibrous material and plaster of paris may be widely varied for different purposes.

An example of a composition well adapted to the purpose is given as follows: Carbonate of or calcined magnesia, 75 parts; asbestus fibre, 20 parts; plaster of paris, 5 parts. This composition may be mixed into a paste by stirring and then molded into tiles or sections. The specification states further:

"I am aware that it is not new to employ magnesia in small quantities in a nonconducting composition, the magnesia being combined with other ingredients—such as steatite and silicate of soda—in order to produce a composition which, when applied to the surface to be covered, will harden into a stone-like casing or shell. In such use the magnesia does not form of itself the principal nonconducting element of the composition, and letters patent to Merrell, No. 170,099, dated November 16, 1875, describe the use of such a composition to form a hard impervious shell or stone-like casing around a nonconducting covering whose principal ingredient is sawdust, hair, rice hulls, or other fiber.

"My composition, whether applied by placing it over the surface of a pipe or boiler, or by moulding it into tiles or sections, includes as its principal element a major proportion of magnesia, and this magnesia forms of itself and is depended on to form the principal and important nonconducting material of the composition. Not only is a composition of about the proportions set forth by me very desirable, because of its great nonconducting character, but it is furthermore desirable because of its extreme lightness. It is, therefore, easily applied with little labor, and does not add materially to the weight of the pipe or other vessel covered by it."

There are three claims, all of which are involved. They are as follows:

"(1) A nonconducting covering or jacket composed of molded tiles or sections, of a composition which includes as its nonconducting element a major proportion of carbonate of or calcined magnesia, substantially as herein described.

"(2) A nonconducting covering or jacket composed of molded tiles or sections of a composition which includes a major proportion of carbonate of or calcined magnesia, and which also includes a sufficient quantity of fibrous material to bind the magnesia together, the magnesia forming of itself the principal nonconducting element of the composition, substantially as herein described.

"(3) The nonconducting composition herein described, consisting of a major

proportion of carbonate of or calcined magnesia, which forms of itself the principal nonconducting element of the composition, and a minor proportion of asbestus fiber sufficient to bind the magnesia together, as herein set forth."

The nonconducting covering of the patent has been manufactured and sold by the complainant and its predecessors, no licenses to others to manufacture having been granted by them.

The defenses are lack of novelty and invention, anticipation, non-infringement, ambiguity and insufficiency of specification.

Hanmore's invention for covering steam pipes and other vessels which radiate heat consists of a nonconducting composition, the major proportion being carbonate of or calcined magnesia, which forms the principal nonconducting element, and a minor proportion of asbestus fiber sufficient to bind the magnesia together. The nonconducting jacket is formed into molded tiles or sections calculated to fit the vessel to be protected. The utility, economy and efficiency of the invention were at once recognized by engineers, architects and the public, and it went into immediate and general use, the output increasing largely from year to year. For 14 years the recognition of the patent by the public and acquiescence in its claims was unbroken and complete. If this were due solely to the conviction that the patent could not be successfully infringed it furnishes persuasive proof of its validity. Though such acquiescence is not conclusive yet, when it exists during nearly the entire life of the patent, it should receive great consideration somewhat approximating that which is accorded a prior adjudication. National Typo. Co. v. N. Y. Typo. Co. (C. C.) 46 Fed. 114; Sargent v. Seagrave, 2 Curt. 553, Fed. Cas. No. 12,365.

No one molested the complainant in the enjoyment of the patent; the defendants were the first to infringe and their infringement did not begin until 1900. As to these facts there can be no question and they are not disputed, but it is urged in palliation of their legal effect that the patent would have been disregarded and infringed if rival manufacturers could have obtained carbonate of magnesia, but that it was impossible to do this as the complainant held a complete monopoly in its manufacture. The record on this subject is exceedingly voluminous and is largely made up of incompetent, irrelevant and hearsay testimony, opinions of the witnesses and assertion not supported by facts. It is, however, probably true that the complainant, by reason of its long established business, its exceptional facilities for the manufacture of magnesia and its large financial resources might have made it difficult for any attempted competition to succeed. The fact that complainant was undisturbed in its enjoyment of the Hanmore invention was due partly to the difficulty in obtaining magnesia, partly to the Keasbey patent and partly to the Hanmore patent. It is not possible to ascertain with precision to what extent the latter patent acted as a deterrent, but that it was the principal factor may fairly be presumed. The complainant denies emphatically that it possessed a monopoly in the production of magnesia and asserts that such a monopoly is and was impossible, for the reason that the processes of manufacture are well known to chemists and the raw material exists in

almost unlimited quantities. The record abounds in statements by the witnesses that they were morally certain, absolutely convinced, and had been repeatedly informed that the complainant would not furnish magnesia for steam pipe coverings and that this fact was "generally known in the trade." One of the witnesses says:

"I believe this monopoly is no more separable from the firm of Keasbey & Mattison, as referred to in years past, than, for instance, is the smell of fish from a fish market."

Another says, referring to the Hanmore patent:

"True, but they considered it of some consequence. Therefore, they would not sell to the trade carbonate of magnesia. They wanted the monopoly of 85 per cent. carbonate of magnesia steam pipe and boiler covering. They wouldn't let anybody else sell it. X-Q. How do you know that if you never made application? A. I am absolutely sure of it, just as sure as I am sitting here in this chair. I am absolutely sure of what I speak. It has been ingrafted into me for so many years that I know it. I am absolutely sure of it."

If the record contains an instance where a responsible buyer made application to complainant to sell him magnesia and was refused the court has overlooked the testimony. There was nothing to prevent other manufacturers from producing carbonate of magnesia by the kieserite process, or even by the dolomite process, except the expense of erecting the plants, and the fact that they did not do so, in view of the large profits which would have resulted, must be attributed largely to the fact that they knew of the existence of the Hanmore patent and respected the complainant's rights thereunder. The fact that the complainant was a large producer of magnesia might have made it unprofitable for small manufacturers, especially in the immediate vicinity, to compete, but the proposition that it was impossible to infringe is based upon imagination rather than upon proof. The defendants' own action is in itself a refutation of their theory. The court is convinced that others would have found means to practice the invention if no patent had existed, but not to the same extent as if magnesia had been cheaper and more easily obtainable. In other words, notwithstanding the large cost it would have been profitable to make the Hanmore covering had no patent been granted, but the existence of the patent rendered such an enterprise an exceedingly dangerous experiment. In short, the acquiescence shown, though somewhat impaired by the facts stated, is entitled to weight in determining the validity of the patent.

The invention is not for a process but for a composition by which magnesia was for the first time practically utilized as a pipe covering. This was done by a mechanical mixture of the magnesia with fibrous material, asbestus being preferred, which binds the magnesia into a durable mass making it available as a heat insulator. This mass is, in no sense, a chemical compound. Although the shape of the sections or tiles is no part of the invention they are shown molded in suitable shapes for application to boilers and pipes. In Hanmore's composition the magnesia constitutes the principal nonconducting element and is the major proportion.

In the example shown the magnesia predominates the other elements by a percentage of 75 to 25. The combination produces a heat insulator which has marked advantages over the others previously in use. It is light, compact and has great nonconducting power; it is simple in construction and easy of application. There is nothing difficult or ambiguous about the patent, its language perfectly plain and simple. If this fact be kept in view many of the difficulties suggested by the defendants will disappear.

It will shorten the discussion if it be conceded at the outset that pipe coverings were old in 1885, with fossil-meal, lime putty, clay, plaster of paris and paper pulp as the nonconducting material and the properties of magnesia as a nonconductor were well known. The principal anticipations relied on are the Nagel patents, the Brigham patent, the earlier Hanmore patent and the patent and publications of Ordway. The prior art does not show the ingredients in the proportion shown in the patent in suit unless the alleged prior use by Andrews is established.

The English and United States patents to Nagel, of January, 1884, are for "improvements in the manufacture of fireproof and waterproof plates" intended to be used as roof coverings to prevent the danger of fire in theaters and other analogous purposes. The patents undoubtedly show a fire proof mass in which asbestos may be mixed with magnesia, but in different proportions and for entirely different purposes. It is thought that nothing contained therein would suggest to the skilled mechanic the steam pipe covering of the Hanmore patent.

The Brigham patent of May, 1884, is for an improved asbestos compound and articles made therefrom. It is intended to take the place of wood and iron in the arts, it is quite hard and is fire and water proof. The drawing shows it applied to the roof of a railway freight car, the "boards" being rabbeted and battened so as to create a water proof joint. The patentee says that "a car or other roof composed of boards, a, a, will be fire and water proof and very durable." The compound is made by incorporating with asbestos, alone or with other fiber, oxide of magnesia in about equal parts with the asbestos and thereafter applying chloride of magnesium to temper and bring the same into a plastic state.

The Hanmore patent of April 15, 1884, is for a "nonheatconducting vessel." The drawings show the invention as embodied in an ice-water cooler. The specification says:

"The invention is applicable to ice-water pitchers, as well as ice-water coolers, and to ice-cream freezers and vessels for carrying and delivering ice-cream, to ice boxes and refrigerators, and, generally, to all vessels the contents of which are artificially cooled."

The nonconducting material is composed of a layer of raw-silk waste wrapped around the vessel, a coating of calcined or carbonate of magnesia plastered on the outside of the silk waste, a superimposed layer of paper, a layer of felt applied outside the paper, a second layer of paper outside the felt and an inclosing case. It is only necessary to read the claims to perceive that this complicated combination is not the simple covering of the patent in suit.

The Ordway patent, of January, 1885, is for a nonconducting composition for refrigerators and safes, but it may be introduced into the floors and walls of buildings to deaden sound and it may be used also as a covering for pipes. When used for the latter purpose the composition, which consists of a combination of granulated cork and water glass, is molded into a pipe having a greater interior diameter than the exterior of the steam pipe to be covered. When the halves of the composition pipe are dry and hard the inner surface is plastered with fossil meal or magnesia made into a thick paste with water. In other words, there is a layer of magnesia or fossil meal next the steam pipe and outside of that another layer made of granulated cork and water glass. The Ordway publications add little to the controversy except that he recognized in 1885 the efficiency of magnesia as an incombustible nonconductor, but about this there is no dispute. Every chemist knew that magnesia was a nonconductor but the difficulty was to utilize and apply it as a practical covering for steam pipes.

The foregoing are unquestionably the defendants' best references and it is evident that none of them anticipates. Neither the fireproof and waterproof plates of Nagel, the roof boards of Brigham, the water-cooler lining of Hanmore, nor the magnesia plastered cork pipe of Ordway infringes the claims of the patent in suit. There is broad language in each which, interpreted in the light of subsequent events, may be said to include the Hanmore covering, but this is true in almost every patent litigation. Brigham, for instance, says:

"I do not desire to limit my invention to the exact proportion of asbestus and magnesium or of paper pulp as the same may be changed and produce articles of undoubted value as to durability and fire and water resisting qualities."

But a valuable patent cannot be invalidated and rights acquired under it destroyed by such general statements. As well might one attempt to anticipate the motor car of to-day by the statements found in the fourth verse of the second chapter of Nahum.

In Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33, the Supreme Court says, at page 555 of 11 Wall. [20 L. Ed. 33]:

"Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use."

Notwithstanding the specimens produced by the defendants it is thought that it is not possible to construct the pipe covering of the Hanmore patent by following the directions of the Brigham specification, or, indeed, of any of the patents in evidence. Hanmore appears to have been the first to construct a nonconducting jacket for steam pipes and boilers, the major proportion being carbonate of or calcined magnesia. His covering at once became popular and a great business was built up under the patent. It is true that, tested by all the after-acquired knowledge, the forward step taken by Hanmore seems a simple one, but that it involved invention to take this step is made clear by an application of the rules

so often enunciated in similar cases. Cantrell v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, 29 L. Ed. 1017; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; Magowan v. Packing Co., 141 U. S. 332, 12 Sup. Ct. 71, 35 L. Ed. 781; Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952. But little need be said of the attempts to prove prior use. They are supported by testimony with which the courts having jurisdiction of patent causes, are exceedingly familiar. Of this testimony the Supreme Court says:

"In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny." Barbed Wire Patent, 143 U. S. 275, 284, 12 Sup. Ct. 443, 447, 36 L. Ed. 154.

The Andrews prior use, which depends largely upon the testimony of John Andrews, took place in Boston, in 1878, 25 years prior to the giving of his testimony. He was then engaged in the business of making boiler and steam pipe coverings, having begun the business the previous year. So, that, if his testimony is to be accepted as accurate, at the age of 32, and at the commencement of his business career as a manufacturer of steam pipe coverings, he had knowledge of the Hanmore combination. The question naturally arises, Is it likely that if he had this "potentiality of becoming rich" within reach he would have permitted it to slip from his grasp? No physical exhibit of the Andrews covering is shown except a so-called sample, which, it is asserted, was placed in a drawer of Andrews' desk in 1878 and remained there until 1903. It is unnecessary to attempt a minute analysis of this testimony. It presents the old situation which arises where human memory is relied upon to establish unimportant and trivial events and circumstances occurring a quarter of a century before. Andrews and the other witnesses, who agree with him in some more or less unimportant features, may be correct, but on the other hand they may be mistaken. The court is convinced that they are not willfully mistaken, but the inherent improbability of the testimony in its entirety, and the fact that Andrews' memory is shown to be exceedingly defective in other matters, compels the court to the conclusion that no impartial mind can be convinced of the truth of this testimony beyond reasonable doubt.

What has been said regarding the Andrews prior use applies with equal or greater force to the so-called Mills and Crabbs prior use.

It is said that the patent as issued is for a different invention from

139 F.—37

that for which application was made. Unquestionably the description and claims were changed to meet the criticisms and suggestions of the officials of the Patent Office, but this is true of a great majority of patents.

Hanmore did not change his invention; he simply made his description more definite and narrowed the scope of his claims to meet the references cited by the examiner. He was clearly within his rights in making these changes. Few patents could survive if the courts should adopt the rule contended for by the defendants. The changes here made are of the same general character that appear in fully half the patents granted. An applicant has a right to alter and amend his specification to conform to the art as the facts are developed in the Patent Office so long as he does not by enlarging the scope of his claims appropriate prior inventions or that which has in the meantime gone into public use. In the present case there were no intervening rights. An amendment to the claims suggested by the specification and drawings is permissible. Hobbs v. Beach, 180 U. S. 383, 396, 21 Sup. Ct. 409, 45 L. Ed. 586.

Other criticisms and objections urged by the defendants have been examined, but in view of what has been already said it is thought that further discussion is unnecessary.

Infringement by the defendants, the Philip Carey Manufacturing Company and the American Magnesia Covering Company, is abundantly proved.

It was stated at the argument by the court that as to the other defendants the bill would be dismissed unless complainant's counsel referred the court to some evidence that they had personally infringed or had, in their individual capacity, promoted the infringement of the two corporations named. No such evidence has been furnished and as to all the other defendants the bill is dismissed with costs in each instance, consisting of the usual docket fee and such legal disbursements as were necessarily incurred by each defendant respectively in presenting his defense. Hutter v. De Q. Bottle Stopper Co., 128 Fed. 283, 286, 62 C. C. A. 652.

The complainant is entitled to a decree for an accounting upon all the claims of the Hanmore patent against the two corporations above named, with costs.