### HALL v. KELLER et al.

#### Civ. 2315.

United States District Court
W. D. Louisiana, Lake Charles Division.

Nov. 5, 1948.
Judgment Modified Feb. 2, 1949.

Thomas E. Scofield and Claude W. Lowe, both of Kansas City, Mo., and Moss & Graham, of Lake Charles, La., for plaintiff.

Reginald E. Caughey, of Los Angeles, Cal., and Plauche & Stockwell, of Lake Charles, La., for defendants.

PORTERIE, District Judge.

The plaintiff bought the allegedly infringing device from J. Frank Keller, a resident of this District, at his place of business in this District; so follows our jurisdiction. Immediately, the manufacturer, the B. & W., Inc., by stipulation, became the real defendant and J. Frank Keller, the local dealer, went out of the suit. The device is a cement casing centralizer, used in the boring of oil wells.[1]

At the trial, the plaintiff placed objectively his device (Exhibit "E") and the infringing device (Exhibit "F") in the record.

To help in knowing what is the subject of this case and in the understanding of its issues, we place here the inventor's sketch accompanying his patent.

---

[1] There develops in the course of the boring of an oil well the necessity to cement the well bore; centralizers are mounted at intervals along the length of the casing, their location being determined by the placing of the cement column and the necessity of keeping the casing centered in the well bore. The diagram of the cement centralizer covered by the patent in suit gives further explanation of the cement centralizer or well cleaner.

Nov. 5, 1940.          J. E. HALL          2,220,237

WELL CLEANER

Original Filed Jan. 6, 1937

Fig. 1.  Fig. 2.  Fig. 3.  Fig. 4.  Fig. 5.

Inventor
JESSE E. HALL
By
His Attorney

The plaintiff has taken three (3) of the sixteen (16) claims of his device, patent No. 2,220,237, dated November 5, 1940, and has pitched this suit thereunder, claiming infringement, and praying for injunction to follow the proof, coupled with an accounting. The claims are as follows:

"1. A well tool of the character described for use on a casing and including, spaced parts applied to the casing, and flexible members extending between and connected to said parts, said members being twisted both helically and tangentically as to the casing to each present a helical, outbowed leading edge for scraping the wall of a bore and a trailing edge that is normally clear of the wall of the bore.

"3. A well cleaner for use on a casing including, collars having free limited longitudinal movement on the casing in spaced relation, and flexible spirally curved members connecting the collars bowed outwardly to bear on the wall of the bore and twisted to scrape the said wall.

"4. A well cleaner for use on a casing including, collars having limited longitudinal movement on the casing in spaced relation, and flexible members rigidly connected to the collars spiralled about the longitudinal axis of the casing, bowed outwardly between their ends and twisted about their individual axes, each member having spaced, overlapping relation as to those laterally adjacent."

The principal functions and advantages of the device of the patent are set forth in plaintiff's advertising literature:

"1. To keep the casing away from the walls of the hole in order to protect the scratchers and permit the cement to completely surround the pipe.

"2. To cut a cylindrical path in tight areas to assure free pipe movement and circulation.

"3. To effectively haul the casing out of drill pipe key seats.

"4. To 'manhandle' or keep thoroughly mixed the cement slurry by turbulence produced with the spiral blades and to prevent channeling.

"5. To remove the major causes which produce sticking of the pipe.

"6. To abrade the walls of the well bore by removing mud cake thereby permitting the cement to bond more readily to the well wall.

"7. To prevent the formation of a thin layer of cement cake upon the well wall prior to congealing and solidification of the entire column."

There have been a number of devices, developed in the course of the past five (5) or six (6) years, similar in general principle to the one device sought to be protected here, as shown by the certified copy of the application of Mr. Hall in the Patent Office; however, the one new added feature in the device of plaintiff is that the spiral bowed springs (common to all previously) now have a tangential or axial twist in the blades, essential to provide leading and trailing edges. These will be seen in the figure two (Fig. 2.) of the printed sketch, designated No. 20 and No. 21, respectively.

We said during the trial, after Mr. Hall had explained the details of manufacture of his device: "This is not a haphazard operation, but a meticulously arranged setting, bending, and everything."

Our conclusion from the evidence of both sides as to the prior art is that previously to the patent in suit all such devices "conformed to the bore of the hole." A conformative device is a device the bowed springs of which touch the bore of the hole without a leading or cutting edge.

The defendant, with much time and care, actually reproduced a device, under the prior art, of the conformity type and it is a physical exhibit in the case (Exhibit D-21). This device, according to the prior art, was made to conform, bow spring by bow spring, to a mandrel and then, putting the mandrel aside, the device was placed together as a whole. The fact is that, from the draftsman's figures accompanying the various devices under the prior art and from the description and the claims in the accompanying applications, no leading (cutting) and trailing (troweling) edges (Nos. 20 and 21, Fig. 2 of the patent diagram), as in figure two of the patent in suit, are drawn or described. Each bow spring at its narrow part fits perfectly, at each

edge against the circumference of the circle drawn to fit around the device (Exhibit D-21) at any point of its length. In Exhibits "E" and "F" the trailing and troweling edge does not touch the circumference of the circle so drawn.

The defendant has established that, from the various itemized descriptions of the patent in suit, the blades of the device should have a cutting edge in their whole length; granting that to be true, yet the claims, as previously quoted, permit by their language a cutting edge along the whole length of the bowed spring or merely to the transverse middle line of the device; then for the other half the cutting edge is permitted to be on the other side of the same bowed spring.

The offending device and the device of the patent in suit show the same axial twist in their springs. This was proved by witnesses on both sides by the placing of a pitched gauge or ring over the device.

This axial twist of the bowed springs has been proved to be of great practical value. It makes all the difference in the world in the sale of the device. The purely cylindrical devices of the prior art have no chance in competition against the devices which have the bowed springs with the cutting and troweling edges.

Though the oil pipe with this device attached to it is not turned one way or the other when it is dropped perpendicularly, because of the fact that these bowed springs are not parallel to the pipe, the cutting edges scrape the well bore. This tends to bring about (1) a straight alignment of the pipe, and (2) leaves the pipe the same distance all around from the walls of the well bore, thus permitting the same thickness of cement to be applied around the pipe. This departure is novel, very ingenious, very helpful, and practical in oil explorations. We think the improvement is patentable. National Machine Works, Inc., et al. v. Harris et al., D.C., 73 F.Supp. 568.

The defendant has made a very strong and thorough defense.

It has claimed that the Shaffer Tool Works, as far back as 1930 and 1931, manufactured and sold spiral centralizers which embodied the construction of the accused structure. It is frankly stated that these centralizers did not have a leading edge along the entire blade. It was shown that one named Jackson had conceived, by the fall of 1930, a centralizer and that the Shaffer Tool Works, by the use of their draftsmen and their machinists, manufactured the spiral centralizer conceived by Jackson. In fact, it was shown that one was actually sold. The evidence develops a device with bowed springs that absolutely conform to a circle and, therefore, had no cutting and troweling edges.

Depositions from many witnesses, draftsmen, blacksmiths, mechanics, etc. who worked upon and brought about this device, are in the record. The manufacture of this former device is done by thorough flattening of the bowed springs over a perfectly cylindrical mandrel, leaving no biting edges to the bowed springs. The patent at issue is a material departure from this.

Defendant says all of this evidence is "solely to prevent the plaintiff from obtaining a scope for the claims which would include the accused device."

We cannot follow counsel for the defendants in his position that the witnesses Thomas and Nelson said either directly or indirectly that there was a leading edge on the Shaffer Tool Works' spiral centralizer. Our view is that clearly and definitely they stated that no additional twist of the bowed springs was made axially after the bowed spring blades had been tapped tight and made to conform to the perfectly cylindrical mandrel. From the evidence, as a whole, it is clear that a leading and trailing edge on these bowed springs never entered the mind of any one concerned with or interested in this Shaffer spiral centralizer.

As an additional defense, exemplified by Exhibit D-21, a spiral centralizer was actually made in California by Mr. Wright, one of the owners of B. & W., Inc., in imitation and in duplication of the Shaffer device. Mr. Wright, a man of mechanical experience and with substantial academic training, explained the construction of Exhibit D-21, with a mandrel and other tools for the purpose.

The device placed of record, after Mr. Wright explained its construction in open court and designated it as Exhibit D-21, does not show leading edges as such. A leading edge to the bowed spring is inferred in this Exhibit D-21 when the bowed spring or blade is held at one end tight to the upper collar and at the lower end pressed over and made to fit tightly on the lower collar. This is merely a casual inference. An examination of defendants' Exhibit D-21 does not show a resultant axial twist caused by a spiral bending of the bowed spring.

■ We hold that invention resides in this improvement made by plaintiff and that the statutory requirements of Section 4886 of the Revised Statutes, 35 U.S.C.A. § 31, are satisfied. We find no evidence in the record that the improvement by Mr. Hall was either known, practiced, or published prior to the date of his invention. On the point that the patent should disclose something amounting to invention, we are of the opinion that the improvement above noted displays practical inventive genius and exhibits an important commercial departure from the prior art. See, Washburn & Moen Manuf'g Co. et al. v. Beat 'Em All Barbed-Wire Co. et al., 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154, 161; Diamond Patent Co. v. S. E. Carr Co., 9 Cir., 217 F. 400; National Machine Works, Inc. et al. v. Harris et al., D.C., 73 F.Supp. 568.

■ The plaintiff enters court with the patent; its validity is presumed and such presumption can only be overcome by clear and satisfactory proof. It is the rule that the burden of proving the patent in suit void rests upon the defendant; this burden the defendant has been unable, though resourceful and diligent, to carry. Donner v. Sheer Pharmacal Corporation, 8 Cir., 64 F.2d 217; Wisconsin Alumni Research Foundation v. George A. Breon & Co., Inc., 8 Cir., 85 F.2d 166.

■ The grant of patent is prima facie evidence that the patent is for a novel and useful invention. Fairbanks, Morse & Co. v. Stickney et al., 8 Cir., 123 F. 79; Stead Lens Co. v. Kryptok Co., 8 Cir., 214 F. 368; Selectasine Patents Co. et al. v. Prest-O-Graph Co. et al., D.C., 267 F. 840; Dovan Chemical Corporation v. Corona Cord Tire Co., D.C., 10 F.2d 598; Buchanan et al. v. Wyeth Hardware & Manufacturing Co., 8 Cir., 47 F.2d 704.

■ Where a patent was issued only after consideration by the Patent Office of the principal prior patents relied upon as anticipations in a suit for infringement, the usual presumption of validity which accompanies the grant is greatly reinforced. Foster v. T. L. Smith Co., et al., 7 Cir., 244 F. 946; Smokador Mfg. Co., Inc., v. Tubular Products Co., 2 Cir., 31 F.2d 255; Ensign Carburetor Co. v. Zenith-Detroit Corporation, 2 Cir., 36 F.2d 684; Hartford-Empire Co. v. Obear-Nester Glass Co. et al., 8 Cir., 71 F.2d 539; Stevens v. Carl Schmid, Inc., 2 Cir., 73 F.2d 54.

■ The prior art must be interpreted from its own disclosure and is not to be aided by ex post facto wisdom. Keasbey & Mattison Co. v. Philip Carey Mfg. Co., et al., C.C., 139 F. 571; Loew Filter Co., et al. v. German-American Filter Co. of New York, 6 Cir., 164 F. 855.

In Naylor, et al. v. Alsop Process Co., 8 Cir., 168 F. 911, 920, the court said: "Prior patents are a part of the prior art only by what they disclose upon their face. If they are carried into effect in the industrial world, what is learned from that experience also becomes a part of the prior art. An expert, however, cannot take a process patent, which has never been applied industrially, and work the process in his laboratory, and discover therefrom something which is not disclosed on the face of the patent, and then transfer that experience back to the time of the patent, and make it a part of the prior art for the purpose of defeating a meritorious invention. That would be ex post facto law of the most pernicious character. Such a practice would be especially misleading in a case like the present." See, Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

■ Prior art devices cannot be aggregated in the light of a patentee's disclosure to build up an anticipation. In Webster Loom Company v. Elias S. Higgins, et al., 105 U.S. 580, 591, 26 L.Ed. 1177, 1181, Mr.

Justice Bradley said: "It is further argued, however, that supposing the devices to be sufficiently described, they do not show any invention; and that the combination set forth in the fifth claim is a mere aggregation of old devices, already well known and, therefore, it is not patentable. This argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed, one which would occur to any mechanic skilled in the art. But it is plain, from the evidence and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. * * * At this point we are constrained to say that we cannot yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to anyone, that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention." See, Weil Pump Co. v. Chicago Pump Co., 7 Cir., 74 F.2d 13, 16; Electric Candy Machine Co. v. Morris, C.C., 156 F. 972, 976; Lewis Invisible Stitch Mach. Co. v. Columbia Blindstitch Mach. Mfg. Corp., D.C., 22 F. Supp. 705.

Exhibits "E" and "F" are nearly physically identical devices; the only difference is that in Exhibit "F" the bowed springs run from collar to collar in a regular curve; in Exhibit "E" the bowed springs leave the collar with little angle, then the curve takes a much more pronounced angle and to the mid-section of the device.

They are particularly identical in the fact that the cutting edge of each blade is not all the way of the blade; when the blade reaches the mid-section of the device, the cutting edge of it becomes a troweling edge to the lower collar; concurrently, the troweling edge of the upper half of the spring becomes the cutting edge in the lower half.

The defendants, in checking the letters in the patent in suit, Letters Patent No. 2,220,337, have clearly shown, and that without debate, that in some part of the descriptive section the bowed spring is indicated with a cutting edge for the whole length of the blade. The plaintiff's retort to this contention is that under the reading of claims one, three, and four (1, 3, and 4), aforequoted, it is very clear that the device may either be with the cutting edge on the same side and for the whole length of the blade or may change alternately from one to the other. The language would certainly authorize the two devices, Exhibits "E" and "F", with blades changing from cutting edge to troweling edge, and vice versa, at middle section of each device.

There is divergent expert opinion in the record as to whether or not, as a matter of law, the two devices would be permitted under the letters patent. We rule with the preponderant legal view that claims one, three, and four (1, 3, and 4) control and that both devices, Exhibits "E" and "F", are permitted within the letters patent in suit. As a layman, we think the mechanical descriptions are merely items of illustration for the construction of the devices and are not exclusive of other mechanical situations. The language in claim No. 1: " * * * said members being twisted both helically and tangentially as to the casing to each present a helical, out-bowed leading edge for scraping the wall of a bore and a trailing edge that is normally clear of the wall of the bore", and the language in claim No. 3: " * * * flexible spirally curved members connecting the collars bowed outwardly to bear on the wall of the bore and twisted to scrape the said wall", and the language in claim No 4: " * * * bowed outwardly between their ends and twisted about their individual axes, each member having spaced, overlapping relation as to those laterally adjacent" permit, once, twice, and thrice, the change from a cutting edge to a troweling edge on the one blade.

The language of the claims governs and the specifications (mechanical illustrations) do not limit the language of the claim. The drawings do not control as against the claims. The prior art is a governing factor in delineating and delimiting the technical

words used in the letters patent; we have already developed that no axial twist of the bowed springs existed at any time under the prior art. Turrill v. Michigan Southern Railroad Co., 1 Wall. 491, 68 U.S. 491, 17 L.Ed. 668; Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 20 L.Ed. 33; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 749, 52 L.Ed. 1122; Flowers v. Magor Car Corp., 3 Cir., 65 F.2d 657; Petersen v. General Seafoods Corporation, 1 Cir., 66 F.2d 459.

■ We conclude that the specifications and claims of the patent in suit comply with the provisions of Section 4888, 35 U.S.C.A. § 33.

There is a contention made by the defendant, B. & W., Inc., that, by virtue of defendants' Exhibits D-18 and D-20, the B. & W., Inc. has interest in the invention described in the patent in suit, including the invention in the claims in issue.

Exhibit D-18 is entitled, "Exclusive License Agreement", dated April 15, 1937, "by and between J. E. Hall and Samuel H. Robinson, hereinafter referred to as Licensors, and Coast Oil Fields Supply Co., a corporation organized and existing under and by virtue of the laws of the State of California, hereinafter referred to as Cosco". This is an agreement with extended provisions covering some fourteen (14) typewritten pages. Hall and Robinson are jointly mentioned throughout under the inclusive meaning of the word "Licensors". They describe themselves as being the owners of numerous casing centering devices, giving the numbers of patents, the names of the patentees, and the dates of issuances, After naming and describing such license devices as being jointly owned or that there is joint enjoyment of license thereunder, we find the following language:

"Whereas, Licensors are the owners of those certain inventions and patent rights covered by an application for United States Letters Patent filed by J. E. Hall in the United States Patent Office on September 3, 1935, bearing Serial No. 38,891, entitled "Casing Attachment"; and that certain application for United States Letters Patent filed by J. E. Hall in the United States Patent Office on January 6, 1937, bearing Serial No. 119,246, the latter invention embodying an improvement and addition to the form and function of the casing centering devices theretofore known and employed in the art, the said improvement and addition being an undertwisting of the spiralled springs embodied in certain of said devices so that the springs so twisted will operate effectively to scrape and clean the walls of the hole, in addition to centering the casing".

It should be noted in justice to the defendant, whose claims in this opinion have been refused, that many of these patents stated to be jointly enjoyed by Hall and Robinson have been all brought into play in this very case and really cover in substance all of the characteristics of Exhibits "E" and "F", except this particular and additional twist axially to the several bowed springs.

Article Sixteen (16), on the last page of this Exhibit D-18, reads as follows:

"Any notices required to be given to either of the parties hereto shall be given as follows:

"To the Licensors:
    "Samuel H. Robinson and J. E. Hall
    "812 C. C. Chapman Building
    "756 South Broadway
    "Los Angeles, California

"To Cosco:
    "Coast Oilfields Supply Co.
    "832 East 60th Street
    "Los Angeles, California

"The said notices shall be deposited in the United States mail, registered with return receipt requested, and postage thereon paid in full. The giving of notices as provided herein shall be deemed complete upon such deposit in the United States mail."

Exhibit D-20 is similarly entitled "Exclusive License Agreement". It is by and between the same parties. The date, however, is earlier than the date of Exhibit D-18. The date is June 12, 1936. The two licensors allege that they are the owners of application for letters patent under Serial No. 38,891, dated September 3, 1935.

There is absent in this Exhibit D-20 the paragraph quoted from Exhibit D-18.

Both of the Exhibits, however, have the identical language just above quoted as Article Sixteen (16); that is, the addresses given by all parties to the contract, whereto notices are to be sent by mail, are all in the state of California.

Section 1962, subdivision 2, of the Code of Civil Procedure of the state of California reads as follows: § 1962. Specification of conclusive presumptions.

\* \* \* \* \* \*

"2. The truth of the facts recited, from the recital in a written instrument between the parties thereto, or their successors in interest by a subsequent title; but this rule does not apply to the recital of a consideration".

We should say at once that the part of the language above: "\* \* \* but this rule does not apply to the recital of a consideration" has no application to the instant case, since the issue of consideration has not been made; in truth, the consideration in the contract was obviously the granting of a patent on the one hand and the payment of royalties on the other.

The effect of the presumption is given generally noteworthy force and effect by its ready local application. See, Knoch v. Haizlip, 163 Cal. 146, 124 P. 998; Parker v. Funk, 185 Cal. 347, 197 P. 83.

The important question we have to answer is whether or not the above provisions of the Code of Civil Procedure of the state of California apply in the instant case. If they do, then the conclusive presumption that the licensors, Hall and Robinson, are the joint owners of not only the patent rights in Letters Patent No. 38,891 but of the patent rights in Letters Patent bearing Serial No. 119,246, series of 1935, which become Letters Patent No. 2,220,237, on November 5, 1940, must be made. That means that "\* \* \* the latter invention embodying an improvement and addition to the form and function of the casing centering devices theretofore known and employed in the art, the said improvement and addition being an undertwisting of the spiralled springs embodied in certain of said devices so that the springs so twisted will operate effectively to scrape and clean the walls of the hold, in addition to centering the casing" is the property of Robinson as well as the property of Hall. It is mutually accepted that the defendant, B. & W., Inc. has proper and legal title from Robinson. Then, it would follow that the B. & W., Inc. has an interest in the patent in suit and consequently plaintiff's claim would have to be dismissed.

From 17 C.J.S., Contracts, (II. What Law Governs) § 12 pages 336-344, we find the following subheads:

"b. Intention of Parties

"In many cases the governing law of a contract is that which the parties expressly or presumably intended, provided such place has a reasonable relation to the transaction, and provided the parties in selecting the governing law acted in good faith.

\* \* \* \* \* \*

"c. Place of Contract

"Many cases announce the general rule that a contract is governed by the law of the place where it was made or entered into. Some of these cases, however, except from its operation contracts which are performable elsewhere, and contracts which show an intent to have some other law govern.

\* \* \* \* \* \*

"d. Place of Performance

"Many cases announce the general rule that a contract is governed by the law of the place where it is to be performed. In some cases an exception is made where a contrary intent or stipulation clearly appears.

\* \* \* \* \* \*

"e. Domicile of Parties

"Ordinarily the domicile of the parties is not a factor in determining the governing law of a contract."

The three rules above, first-quoted, are applicable. We shall now find the facts generally, without placing them under any particular subhead, because many of them belong to more than one subhead.

From the evidence in this record it is disclosed that Hall was here and there in two states, Texas and Louisiana, establishing contacts for the sale of the coming Cosco device, at about the time the contract

was being drawn and prepared by Robinson in Los Angeles; so, it follows that the place of contract could not be the places of his physical presence for that would furnish the laws of two states, changeable from day to day. As to the applicability of the rule as to the place of performance if the place of the sale of the device is a place of performance, that is found to be not practical, because the contract provides for the licensing of sales " * * * throughout all parts of the United States, except the states of California, Oregon, Washington, Idaho, Montana, Utah, Nevada and Arizona * * *". The inapplicability of this principle is immediately apparent for you would then have to pick one law from the laws of forty (40) states, for you have that many possible states as places of sale.

It is true that Hall was moving around at about the time of the signing of the licensing contract in the states of Louisiana and Texas, which are included as places of sale; but, the weight of this, in our opinion, cannot offset the actual specific giving of their permanent addresses as being in the state of California and the other reasons given herein.

Determinatively, to a strong degree, the place of manufacture of the device by Cosco should be considered as the place of performance of the contract. It is not to be questioned but that the place of manufacture of the devices was the state of California.

There are sixty seven (67) pages to the file wrapper and contents (Plaintiff's Exhibit "C") of Mr. Hall in Letters Patent, No. 2,220,237, ranging in date from the year ¯1935 to the year 1940. He shows, repeatedly and invariably, in these many letters as a continuous resident of the state of California, city of Los Angeles. The dates of the two "Exclusive License Agreements", Exhibits D-20 and D-18, are June 12, 1936 and April 15, 1937, respectively, during the very heart of the time that Hall was building his file wrapper to attain Letters Patent, No. 2,220,237.

As to Robinson's declared domicile and intended or actual residence, plaintiff has placed in the record the originals of six (6) of Robinson's letters, dated between April 8, 1937, and May 18, 1937, the contents of each having reference to the Cosco contract. The heading is embossed and is in this note: "Samuel H. Robinson, Attorney at Law, 756 South Broadway, Los Angeles, Trinity 6311". This is the notice address given by Robinson in the Cosco contract. He is accepted as a Los Angeles attorney.

Their work on these devices was in the state of California. The stagesetting for the making of these devices was in the state of California. When they drew the contract their attorneys or the drafters were in the state of California. The laws of the state of California must control their personal actions and statements.

Hall and Robinson were friends at that time. The inference is inescapable from the very language used in stating their joint ownership that they must have been collaborators in the improvement of these devices and are to be partners in their commercial production. Mr. Hall, knowing that without question Mr. Robinson was the co-owner of the invention and of the patent rights covered by No. 38,891 and knowing additionally that to a great degree these already-owned rights involved in substance all that he had in his Letters Patent No. 119,246, willingly agreed to their binding joint statment of ownership in the contract, as aforequoted. The consideration to Hall is that Robinson would join formally in the licensing, so that Cosco would feel safe in expending money in the commercial production. Cosco then knew from the binding statement that it would be free of hindering litigation. Mr. Hall agreed to the language of this paragraph with full or imputed knowledge that the laws of the state of California should apply. He gave his address for notice as such and, in law and in justice, he made Robinson the co-owner of the " * * * improvement and addition being an undertwisting of the spiralled springs embodied in certain of said devices so that the springs so twisted will operate effectively to scrape and clean the walls of the hole, in addition to centering the casing".

Besides, we have been ruling in favor of plaintiff, Mr. Hall, on the merits by turn-

ing very, very close corners and now, in good conscience, it would seem that this is a corner that we are unable to make for him.[2]

■ So, we rule in consonance with subdivision "b. Intention of Parties" as to what law governs, 17 C.J.S., Contracts, § 12b, page 336, to the effect that "* * * the governing law of a contract is that which the parties expressly or presumably intended, provided such place has a reasonable relation to the transaction, and provided the parties in selecting the governing law acted in good faith."

■ The laws of the state of California have a reasonable relation to the transaction because Hall and Robinson, on the one hand, and Cosco, on the other hand, were citizens of the state of California. The manufacture of the devices was the main object of the contract; that is to be in California—conclusively the real place of performance.

Though Hall was traveling about in his business, all three parties were domiciled in the state of California and gave their permanent addresses in an important contract, the very one to be interpreted herein, as being in the state of California.

There is also good faith in their implied selection of the governing law. The transaction with Cosco antedates this present suit over ten (10) years. Mr. Hall profited by the application of the laws of the state of California, as he intended to profit, in that Cosco would not have entered into the contract unless the decks were cleared of molesting patent suits involving infringement.

A reading of the six (6) letters from Robinson, invariably written from Los Angeles, to Hall, placed in the record by Hall, the plaintiff, will show that Hall had to acknowledge Robinson as a joint owner, because Cosco, with whom they were dealing, had to have assurances of legal peace. In one of these six letters, the one dated April 15, 1947, Robinson writes, as follows:

"When Cosco first dealt with Koen there was reason for feeling considerable apprehension that Steps or some other patentee might sue. That situation has been completely changed. *We are now licensed under all the basic patents and in addition have certain important claims of our own.* The license under which Mr. Koen can now operate, places him in a position where, far from feeling that he need fear any adverse position, he is completely protected and is himself, in fact, *in a position to require others to desist from any infringement on the Hall Cleaner.*

"Backed as we are by the Burgher, Irvine, Steps and Hall patents, there is not the slightest reason in the wide world why Koen should have the least fear of any litigation. If and when it should arise, an agreement with reference to it can be made at that time. After all, we have to defend our position if it becomes threatened but we should be permitted to do it in our own way. Koen is getting as much and probably more benefit out of this than anybody else and therefore should bear his corresponding part of the burden." (Emphasis ours)

So, under the three controlling principles as to what law governs in this contract, taken from 17 C.J.S., aforequoted, the laws of the state of California are the applicable laws and, consequently, the conclusive presumption applies. Hall and Robinson are co-owners of the patent in issue. After the full trial of the instant case, all re-

---

[2] One of the close points: Defense counsel at p. 77 of his brief says: "Furthermore a reading of the file wrapper together with the arguments both of the patent attorney and Mr. Hall will show that the function of troweling when going into the hole and the function of scraping coming out of the hole was emphasized as peculiar to the construction of the centralizer described in the specifications. It is only when the leading edge is along the entire length of the blade that the structure will so function." But the devices, Exhibits "E" and "F" both, do not have a leading edge along the entire length of the blade. The twist is reversed at their mid-sections. It would seem that the plaintiff might be estopped by limitations imposed on him during the prosecution of the application (See File Wrapper and contents and brief of defendants) and that such limitation would prevent Hall from asserting a scope now to include the accused structure.

lations considered, and particularly the actual "Exclusive License Agreement", we think the application of the conclusive presumption achieves substantial justice.

▆ Pretermitting the use of the section of the Code of Civil Procedure of the state of California altogether, we are of the opinion that it was the clear intent of Mr. Hall to pass title to one-fifth (1/5th) of his invention in Letters Patent No. 2,-220,237, the patent in suit. The general language of the whole contract, plus the particular language of the paragraph quoted, is clear on the point and there is left no ambiguity. What is the consideration? The consideration is just exactly what we stated before. It was that Cosco would not produce this device unless Robinson became the co-owner with Hall on the particular improvement. Cosco did not want to put up a big money outlay to be disturbed with litigation when the device would be placed on the market for sale—litigation accompanied by injunction.

· The recital clause from defendants' Exhibit D-18, aforequoted, is clearly unambiguous; in the very first line we have, "* * * Licensors are the owners of those certain inventions and patent rights * * *", clearly in the plural; then later in the paragraph, Letters Patent No. 38,891 is one; then the second is clearly, * * * that certain application for United States Letters Patent filed by J. E. Hall "* * *", etc., "* * * bearing Serial No. 119,246," (for the sake of brevity the rest of the paragraph is not added); but the rest of the language is specifically descriptive of the very claim that we declared to be patentable and comprising the patent in suit, to wit: Letters Patent No. 2,220,237.

We should consider the reasoning of plaintiff on this issue.

The plaintiff's theory is that different patentable subjects united in one patent will not vitiate the patent, if they all relate to the same general matter or are otherwise connected; then, to follow plaintiff, a single patent may have two constructions, with a claim for each; and to follow plaintiff further, there may be a separate owner for each one of the two claims; and that is when and where we have Hall and Robinson as joint claimants of the first claim and Hall the exclusive claimant of the second claim. We grant this legal argument (and plaintiff has cited cases to support it); but that argument begs the question that is answered by the language of the recital clause, aforequoted, and that is, after this legal argument is given its full force and effect, Hall and Robinson sat down and agreed to the joint and common ownership of all the claims to satisfy Cosco, the prospective manufacturer of the device.

Next, we quote the full statement of plaintiff in his supplemental brief: "The issues in the instant case are not to be confused by predicating the invention acquired through the Robinson assignments upon the invention of the claims in suit. By those instruments defendant, B and W, Inc., obtained rights in the abandoned application and such claims of the abandoned case as were transferred into the application of the patent in suit. None of such claims were sued upon and are, therefore, not involved in this controversy. There is a distinct line of demarcation between the claims shifted from the abandoned application and those in suit. In the claims that were transferred from the abandoned case there are covered certain structural features of a mounting which has been employed by Hall in the application of his centralizers to a casing. This mounting includes elongated pitched slots cut in the collar of the device which cooperate with lugs welded upon the periphery of the casing. The claims in suit, however, are not restricted to this type of mounting but are drawn to the invention of tangential twisting of the spiral flexible members to produce the leading or cutting edges and are not limited to any particular type of mounting except that the device shall have 'limited longitudinal movement' on the casing. Thus, it will be seen that defendants' contention that the scope of all of the claims, including those in suit, must be limited to the mounting shown is improper and is without basis in the law of claim interpretation."

The plaintiff is blowing hot and cold in this case; if we follow him in this latter position, why then he loses the case on the merits.

Moreover, the language of the "Exclusive License Agreement", aforequoted, is all inclusive. The technical differentiation sought to be made by plaintiff, granting it to be true for the sake of argument, that "none of such claims were sued upon and are, therefore, not involved in this controversy", is immaterial and irrelevant. Any and all phases of any and all patent rights —particularly the effect and result of the twist of the bowed springs—were included to Cosco.

So, we now turn to the findings of fact and conclusions of law:

### Findings of Fact.

1. This court has jurisdiction of the subject matter and of the parties to the action.

2. Defendants had knowledge of and were given notice of infringement before the complaint was filed.

3. The controversy between the parties involves the infringement of claims one, three and four (1, 3, and 4) of Hall patent, Letters Patent No. 2,220,237, issued November 5, 1940 to the plaintiff.

4. Said defendants are charged with infringement of said claims because of the manufacture and sale of spiral centralizers as exemplified by plaintiff's Exhibit "F".

5. The defendant, B. & W., Inc. is the real defendant in interest and has assumed the defense of the litigation and controls the same and was made a party-defendant at the trial of the cause.

6. Prior to the filing of the application of the patent in suit, the plaintiff, Hall, filed an earlier application, Serial No. 38,891, as shown by plaintiff's Exhibit "D", and said application became abandoned; prior to said abandonment the invention of said application Serial No. 38,891 was disclosed in the application of the patent in suit and said application became a continuation of said abandoned application.

7. The tangential or lateral twisting of the out-bowed guide springs bestows a degree of novelty and utility upon the well cleaner.

8. The tangential and lateral twisting of the out-bowed guide springs renders the three (3) claims in suit patentably distinct from the claims granted on the invention of the abandoned application, Serial No. 38,-891.

9. None of the prior art patents cited in the answer discloses an apparatus which anticipates the inventions covered by claims one, three, and four (1, 3, and 4) of the patent in suit.

10. Defendants have failed to establish a statutory bar in the prior uses of Robert H. Jackson and the Shaffer Tool Works which would invalidate the three (3) claims in suit.

11. Samuel H. Robinson of Los Angeles, California, by an assignment in writing, defendants' Exhibit D-17, acquired an interest in and to said abandoned application and the invention described therein; the defendant, B. & W., Inc., by virtue of the written instruments Exhibits D-28 to D-32, inclusive, acquired all of the right, title and interest of said Samuel H. Robinson in and to said application and said invention and in and to said invention as carried over and embodied in any of the claims in the patent in suit.

12. The accused structure, plaintiff's Exhibit "F", does not include spiral springs having a tangential twist therein so that each spring has a leading edge on one side for its entire length.

13. Shaffer Tool Works of Brea, California, in 1930 and 1931 manufactured spiral centralizers as exemplified by defendants' Exhibit D-21 and thereafter sold the same for use in oil wells; said spiral centralizers were constructed substantially in accordance with the accused structure, plaintiff's Exhibit "F", but did not include spiral springs having a leading edge and a troweling edge.

14. The defendant, B. & W., Inc., by virtue of defendants' Exhibits D-18 and D-20, and in accordance with § 1962, subdivision 2 of the Code of Civil Procedure of the state of California, is the owner of an interest in and to the invention specifically described in the specifications and shown in the drawings of the patent in suit and as embodied in and covered by the claims in issue, and each of them.

15. The defendant, B. & W., Inc., by virtue of defendants' Exhibits D-18 and

776

D-20, pretermitting the existence and the applicability of § 1962, subdivision 2 of the Code of Civil Procedure of the state of California, is the owner of an interest in and to the invention specifically described in the specifications and shown in the drawings of the patent in suit and as embodied in and covered by the claims in issue, and each of them.

Conclusions of Law.

1. Claims one, three, and four (1, 3, and 4) of United States Letters Patent No. 2,-220,237, issued to Jesse E. Hall, November 5, 1940, are good and valid in law.

2. The defendant, B. & W., Inc., is the owner of an interest in and to the invention specifically described in the specifications and shown in the drawings of the patent in suit and as embodied in and covered by the claims in issue, and each of them.

3. A final decree will be entered herein dismissing the cause of action, providing for the recovery by the defendants of their costs of suit and disbursements, including the costs of the reporters' transcript and reasonable attorneys' fees in the discretion of the court as provided by the Patent Statutes.